CARL E. THISTED, ET AL., PLAINTIFFS AND APPELLANTS, *v.* TOWER MANAGEMENT CORPORATION, A CORPORATION, JULIUS C. PETERS, AND JOHN DUNCAN, DEFENDANTS AND RESPONDENTS.

No. 10840.
Submitted April 15, 1965. Decided January 7, 1966.
409 P.2d 813.

2

See **C. J. S.**, Corporations, § 548.

Swanberg, Koby & Strope, Randall Swanberg (argued), Great Falls, for appellants.

Howard C. Burton (argued), Great Falls, for respondents.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment against plaintiffs- appellants on the counterclaim of the defendants-respondents in which the plaintiffs were adjudged indebted to defendant Tower Management Corporation in amounts totalling $24,

252.41. Trial was without jury before the district court of the eighth judicial district of the State of Montana, in and for the County of Cascade.

The plaintiffs were denied the relief asked for in their complaint, which contained the following two counts: (1) that the election of defendant, Julius C. Peters, to the board of directors of Tower Management Corporation be declared void, and; (2) to enjoin defendants, Julius C. Peters and John Duncan, assuming to act as directors of Tower Management Corporation, from obligating that corporation for an estimated $45,000. The plaintiffs, ten in number, are all stockholders in Tower Management Corporation, each being individually the owner of one share of non-par stock issued by the corporation.

The facts surrounding this case are well known to this court due to previous litigation. Notice has been taken of the facts and conclusions found in those cases—namely, causes numbered 10809, Thisted v. Country Club Tower Corp., 146 Mont. 87, 405 P.2d 432, and 10956, State ex rel. Burris v. Tower Management Corp., 145 Mont. 448, 401 P.2d 575, in this court. Some repetition of the facts is required here.

Defendant, Julius C. Peters, during the years 1954 and 1955, embarked upon a plan to build a large apartment house in Great Falls, Montana. A corporation known as the Country Club Tower Corporation (hereinafter called Tower) was formed to accomplish construction of the apartment building. The building was completed in 1957 and in May of that year another corporation was formed for the purpose of managing the apartment building. This corporation was named Tower Management Corporation (hereinafter called Management). The incorporators and directors were Julius C. Peters, Frank B. Shanley and John H. Duncan, the latter being Peters' son-in-law. Tower conveyed to Management the entire apartment building, reserving to itself, however, the twenty apartments contained in the building, and receiving in return the entire capital stock of Management, i. e., twenty shares of non-par

stock. Management was incorporated as a non-profit corporation.

The apartment building, known as Country Club Tower Apartments, is of the unit-dwelling or condominium type, wherein apartments were sold with fee simple title thereto passing to the purchaser. See 15 Am.Jur.2d, Condominiums and Cooperative Apartments, 977. In addition to receiving fee simple title to the apartment purchased, such purchaser also received and thereafter was the owner of one share of non-par stock in Management.

Peters has remained as one of three directors and has held the office of president of Management since its incorporation.

The crucial question to be resolved in this case stems from an election of directors of Management held on May 20, 1963, and the actions taken by those directors thereafter. The following chronological synopsis of events, as taken from the meeting records and minutes before this court, is necessary for full understanding of the events leading up to this election.

February 14, 1963. Plaintiff-apartment owners became aware of extensive remodeling of apartments as yet unsold and owned by Tower. A set of blueprints was discovered which led the plaintiffs to believe that a lounge and restaurant were being constructed in the apartment building.

February 16, 1963. Eight of the plaintiffs contacted Peters by letter requesting information relating to the remodeling and its purpose. No information was given.

February 23, 1963. Seven plaintiff-apartment owners demanded a special stockholders' meeting of Management.

March 4, 1963. A special stockholders' meeting was held with Peters acting as chairman of the meeting, and he refused to convene the meeting on the ground that there was insufficient notice given of the same. It should be noted that notice irregularities could be waived according to the bylaws of Management, but Peters and Duncan refused to waive the notice irregularities.

The minutes of this meeting, on file with this court, will be referred to hereafter.

March 13, 1963. Notice was mailed to the stockholders of Management of a special meeting to be held on March 29, 1963. This notice stated the purpose of the meeting was to consider: (1) construction of a weatherproof roof over the apartment building's sundeck; (2) refurbishing of the building's windowsills; (3) painting of the building's exterior walls; and (4) enlargement of the building's lobby.

March 15, 1963. Plaintiffs in this action filed a complaint and commenced an action which eventually reached this court as Cause No. 10809. This court rendered its opinion in that cause in July, 1965.

March 29, 1963. At the meeting called for this date, Peters announced that "A majority in the number of stockholders" was found not to be present and the meeting was not competent to transact business and was adjourned to a day certain, being to April 12, 1963.

April 12, 1963. The record shows that prior to the meeting on this day, John H. and Mildred A. Duncan became joint tenant owners of one share of stock in Management.

At this meeting four persons representing five stockholders, collectively owning eleven shares of stock in Management, were present and Peters declared "that eleven (11) of twenty (20) of the outstanding shares of corporate stock were represented in person or by proxy; that a majority of the stockholders were present and that the meeting was competent for the transaction of business."

These four persons then proposed and adopted resolutions relating to (1) the addition of an all-weather roof over the sun deck; (2) refurbishing of the building's windowsills; (3) painting of the building's exterior walls; (4) employment of an architect to further these plans where required; (5) remodeling of the lobby; (6) compensation of Mr. Pohlod for past and future services to the corporation.

Frank B. Shanley, an original incorporator and director of Management, resigned.

A special meeting of the board of directors of Management was held at which time Shanley's resignation was made official. The remaining directors, Peters and Duncan, then considered the resolutions passed at the earlier stockholders' meeting.

May 20, 1963. The annual stockholders' meeting for the election of directors for Management was held. At this meeting it appeared that Frances Strain's apartment had been transferred to Jane Matteucci. There was discussion with regard to whether her stock had been transferred on the books, but Jane Matteucci was allowed to vote. The election was deadlocked, four candidates each receiving fifteen votes. Peters was presiding and he stated: "We shall declare the vote of Jane Matteucci as not being a valid vote according to the bylaws; you can read the bylaws as to who is entitled to vote." Though contention was made that Mrs. Matteucci was the equitable holder of the share of stock and was entitled to vote, her vote was stricken. It is this election which is contested in this action.

The directors elected at the earlier stockholders' meeting met and elected the corporation's officers.

Numerous other meetings of the directors were held at which action was taken, and money borrowed to accomplish and pay for the projects above-mentioned. At one of these meetings, on May 25, 1963, the board of directors adopted a budget for fiscal 1963 which was to commence on June 1, 1963. This budget was in the amount of $100,000.00.

Several of the plaintiffs' specifications of error are concerned with the election procedure employed at the meeting of May 20, 1963, and the resulting election of Julius C. Peters to the board of directors of Management.

To resolve these questions, it is necessary to understand the equitable relationship between Management and its stockholders.

Management was formed according to its articles of incorporation, for the purpose of operating the Country Club Tower Apartments for the benefit of stockholder-apartment owners without rent or other profit to the corporation excepting the necessary expenses of upkeep, repair, operating and care of its properties, the expenses for such activities to be collected by assessments levied against the stockholder-apartment owners.

The total capital stock of this non-profit corporation consists of twenty non-par shares of stock representing the corporation's sole asset which we shall designate as the "common elements" of the apartment building. For definition of "common elements" see Chapter 120, Laws of 1965.

Ownership of a non-par share of stock in Management gives such owner his aliquot interest in the corporation's assets in terms of fractions rather than dollars. Gallatin County F. Alliance v. Flannery, 59 Mont. 534, 537, 197 P. 996; 11 Fletcher Cyclopedia, pp. 41-51, §§ 5085-5090.

The bylaws of Management provide that each share of stock "shall be definitely allocated to a specific apartment in the building."

The bylaws further provide for the transfer of apartments and the share of stock allocated thereto as follows:

"Any transfer of ownership of such apartment *shall automatically transfer ownership* of the share of stock allocated to that apartment to the new owner thereof, whether such transfer be by voluntary transfer or by operation of law, or otherwise." (Emphasis ours.)

Throughout the articles of incorporation and the bylaws of management the words "stockholder-apartment owner" are used.

The articles of incorporation, the bylaws and the choice of words used therein convince this court that at the instant one becomes an "apartment owner" he also becomes a full-fledged owner of one share of stock of Management with all the rights

and duties inherent in such ownership attaching at that moment.

We are dealing here with ownership of shares of stock in a close, non-profit corporation. To become a stockholder in this corporation, one must first become an apartment owner in Country Club Tower Apartments. At the moment one becomes an apartment owner, he is subject to the rules and regulations of Management regarding his use of the "common elements" of the apartment building. Reciprocally then, he at the same time becomes the owner of the one share of stock of Management allocated to the apartment just purchased in fee simple title. See generally 11 Fletcher 53, § 5091 et seq.; 18 Am.Jur.2d, Corporations, § 242, p. 766. This equitable ownership carries with it all the inherent rights of such ownership, regardless of the temporary lack of evidence of such ownership on Management's books of record. Stock books and stock transfer records of a corporation serve as evidence to both creditors and the corporation of actual stockholders therein. As between Management and its stockholders, it is inconceivable that Management would at any time be without knowledge of the identity of its stockholders. This apartment building was conceived with the idea of it being a dwelling for friends and acquaintances and persons of common interests. It was necessary by agreement that the advice and consent of a majority of apartment owners be secured before hopeful purchasers could buy an apartment and live in Country Club Tower Apartments. Since the only forum for such approval is through Management it is not possible that that corporation would not be aware of a person who has actually purchased an apartment, either from Tower or from a present apartment owner. Therefore the books of Management, which in good faith should be immediately corrected to properly reflect ownership of shares, have no binding effect upon the rights of actual apartment owners to vote upon the share of *stock automatically transferred* to them upon the transfer of an apartment to them.

That the usual formalities of corporate law regarding presentation, demand, cancellation and reissuance of stock certificates is waived in the instance of this corporation as is reflected by its bylaws, which provide:

"In the event of any transfer of any apartment, the officers of this corporation are authorized to cancel the former owner's record ownership of stock and to issue a new certificate allocated to said apartment to the new owner thereof."

The court hastens to add at this point that even though we have determined that equitable ownership of shares of stock attaches prior to evidence upon the corporation's books of such ownership, that the corporation is bound to maintain its books and records in good faith so that these records promptly reflect the equitable ownership.

The plaintiffs contend that the district court erred in finding Tower a stockholder of record in Management of seven shares of stock and thereby entitled to vote upon such shares. By reason of what has been heretofore said this has already been answered. The ownership of shares of stock in Management need not be first evidenced in that corporation's books of record before such owner has the right to vote upon his share of stock. Cotter v. Butte & R. V. Smelting Co., 31 Mont. 129, 133, 77 P. 509. There is no question that Tower was the original owner of all twenty apartments in Country Club Tower Apartments, and that at the time of the election here in dispute, May 20, 1963, that Tower was then the owner of the unsold seven apartments. Shares of stock of Management definitely allocated to such apartments followed the ownership thereof and Tower was entitled to all the privileges, rights, obligations and duties inherent in such ownership.

This same reasoning resolves the dispute concerning the vote cast by Mrs. Matteucci at the May 20 election as will appear hereafter. She had previously purchased her apartment from Mrs. Strain, the warranty deed being delivered to her in April 1963. Management was fully aware of this transfer of

ownership of that apartment, but such transfer had not yet been recorded in the corporation's books. The disqualification of her vote, on the grounds that Mrs. Matteucci was not a stockholder of record since she had not been issued a valid certificate of stock evidencing such ownership, was improper under the equitable theories above explained. At the moment she became an apartment owner, she also became the equitable owner of one share of stock in Management and was at that time entitled to exercise the rights inherent in such ownership.

This brings the court to consideration of the May 20, 1963 election of directors for Management.

The minutes of that meeting show the following persons were present and voted as shown.

| NAME OF STOCKHOLDER | NO. OF VOTES | NOMINEE |
|---|---|---|
| (A) Frank and Margaret Shanley by proxy Swanberg | 3 | Humphrey |
| (B) Norman Thisted | 3 | Humphrey |
| (C) Carl Thisted | 3 | Humphrey |
| (D) Robert Schell | 3 | Humphrey |
| (E) Jane Matteucci | 3 | Humphrey |
| (F) Helen Flowerree by proxy Ford | 3 | Carl Thisted |
| (G) Bessie Durnin | 3 | Carl Thisted |
| (H) Elizabeth Roberts | 3 | Carl Thisted |
| (I) Mrs. George Shanley by proxy Paul Matteucci | 3 | Carl Thisted |
| (J) James Humphrey | 3 | Carl Thisted |
| (K) Julius Peters | 3 | John Duncan |
| (L) Highwood Corp., by proxy Pohlod | 3 | John Duncan |
| (M) Tower Corp., by proxy Duncan | 9 | John Duncan |

(N) Tower Corp., by proxy
Duncan                                  12          Julius Peters

(O) John and Millie Duncan
by proxy Burton                          3          Julius Peters

Tally of the votes reveals 15 votes apiece for Humphrey and Thisted, both nominated by the plaintiffs in this action, and 15 votes apiece for Duncan and Peters, each nominated by the other.

In view of what we have heretofore stated the vote of Mrs. Matteucci should not have been stricken and her vote should be counted, thereby reinstating a total of 15 votes for Humphrey, and the initial deadlock of this vote again prevails. "That which ought to have been done is to be regarded as done, in favor of him to whom, and against him from whom, performance is due." R.C.M.1947, § 49-121.

There is an abundance of evidence throughout not only this case, but also others previously before this court involving essentially the same parties, that this deadlock or balance of power between the stockholders of Management, and the efforts on both sides to gain a majority have caused great injustice and abuse. Bitterness now replaces what had been friendship and cooperation. This bitterness has caused one or the other party at times to attempt to rely upon strict rules of corporation law, in attempts to thwart or control the other. The corporation was never handled in any other than a most informal manner. All parties have considerable investments in Country Club Tower Apartments. To permit either side to gain a majority and control Management under the feelings and emotions which now prevail would be to permit inequity and abuse. See 19 Am.Jur.2d Corporations, § 538, p. 75. "For every wrong there is a remedy." R.C.M.1947, § 49-115.

Three possible solutions are available when a corporation finds itself in an absolute deadlock. The first is to permit incumbent directors to retain their positions until new elections can be held. At the time this election was held, the di-

rectors were Peters and his son-in-law John Duncan. Duncan has since resigned (December, 1963) from the board of directors, narrowing our consideration to Peters alone. It is clearly reflected in the record in this case that Peters has not acted in a fiduciary manner toward the stockholders of the corporation of which he acts as a director. The minutes from stockholders' meetings show without a doubt that Peters not only threatened the stockholders with a law suit should they interfere with his plans concerning the remodeling of the remaining seven apartments owned by Tower, but also that he refused to explain what his plans in that regard were, how such plans might affect Management, and when pressed by questions put to him by the stockholders, proceeded to "walk out" of those meetings before adjournment, and in fact, he walked out of the meeting of May 20, 1963, at which he had declared himself to still be a director of Management. See 19 Am.Jur. 2d, Corporations, § 1281, p. 688. The behind-the-scenes manipulations exercised by Peters in an attempt to maintain control of the corporation further indicate his lack of good faith and constitute a breach of his fiduciary relationship to the stockholders of Management. "No one can take advantage of his own wrong." R.C.M.1947, § 49-109. See, also, R.C.M.1947, §§ 49-104 and 49-106.

"They [directors] are required to act in the utmost good faith, and in accepting the office they impliedly undertake to give to the enterprise the benefit of their care and best judgment and to exercise the powers conferred solely in the interest of the corporation or the stockholders as a body * * * and not for their own personal interests." 19 Am.Jur.2d, Corporations, § 1272, p. 679. See also 52 Northwestern Law Review 394.

It would be unconscionable for this court to allow Peters to maintain himself as a director of Management in light of his past performance in that capacity. Peters, due to his continuous breach of his fiduciary relationship, must be stripped of his position as an officer and director of Management.

The remaining two solutions are dissolution of the corpora-

tion or receivership. Dissolution is, in reality, an impossibility in this situation.

It is to be noted that a close corporation is one in which management and ownership are "substantially identical to the extent that it is unrealistic to believe that the judgment of the directors will be independent of that of the stockholders." 52 Northwestern L.R. 345. By its very nature, intracorporate problems arising in a close corporation demand the unusual and extraordinary remedies available only in a court of equity.

In another action pending in the district court entitled First Westside Bank of Great Falls v. Tower Management Corporation, the district court provided for the appointment of a receiver and one was appointed in February 1965, to "take charge of the Country Club Tower Apartment building in conjunction with the two directors" of Management. He was given authority to determine and collect the necessary assessments required to operate the apartment building. He was also given general authority "to take such other steps as may be necessary in the circumstances to preserve the rights and property of all the parties" involved. This district court case was before us in an original proceeding, Cause No. 10956, referred to supra.

Receivership is an extraordinary remedy and the power of the court to appoint a receiver is to be exercised with extreme caution. The facts and circumstances of this case clearly require the exercise by the court of this power. R.C.M.1947, §§ 93-4401 and 93-4406 grant broad statutory authority for such appointment. The appointment of a receiver "is held to suspend the incidental powers of the board of directors." 19 Am.Jur.2d, Corporations, § 1148, p. 579.

The district court, therefore, has the power to grant authority to a receiver so that he in fact replaces the board of directors and the officers of Management and assumes complete control of that corporation. He should preside over stockholders' meetings. He should be authorized to operate the corporation within the scope of powers and with the intent of ful-

filling the purposes of Management according to its articles of incorporation and its bylaws.

See generally 19 C.J.S. Corporations, § 1459 et seq., p. 1163. See O'Neal, Close Corporations, § 9.26 et seq.

So long as the present status quo is maintained, with a receiver controlling the corporation, neither party need worry about the other gaining a majority and thus gaining control over the corporation. The rights and interests of all parties would be protected. Management could no longer be used to promote private interests or to work abuses and inequities upon those connected with it.

This court stated in Thisted v. Country Club Tower Corporation, supra, quoting from Fey v. A. A. Oil Corp., 129 Mont. 300, 318, 285 P.2d 578:

"Courts of equity are not bound by cast-iron rules. The rules by which they are governed are flexible and adapt themselves to the exigencies of the particular case. Relief will be granted when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. See Parchen v. Chessman, 49 Mont. 326, 142 P. 631, 146 P. 469."

The plaintiffs have challenged the findings of the lower court concerning the legality of the budget adopted by Management for the fiscal year June 1, 1963, to May 31, 1964.

The record reveals that on March 29, 1963, a special stockholders' meeting of Management was called. The following persons were present:

Julius C. Peters and Julia A. Peters—1 share by proxy Baucus

Highwood Corporation—1 share by proxy Pohlod

Country Club Tower Corporation—8 shares by proxy Duncan.

The president (Peters) declared that a majority in number of the stockholders were not present and that therefore pursuant to the provisions of Article One, Section One of the bylaws, the meeting was not competent for the transaction of

business. The meeting was then adjourned to April 12, 1963. On that date, call of the roll revealed the following were present:

Julius C. Peters and Julia A. Peters—1 share in person

Highwood Corporation—1 share by proxy Pohlod

Country Club Tower Corporation—7 shares by proxy Duncan

Frances S. Strain—1 share in person

John H. Duncan and Mildred A. Duncan—1 share in person

The president (Peters) declared that eleven of twenty of the outstanding shares of corporate stock were represented in person or by proxy; that a majority of the stockholders were present and that the meeting was competent for the transaction of business

It is more than interesting to note the different language used by Peters at each meeting. At the March 29th meeting, the language "a majority in number of stockholders were not present" was used. On April 12, the language "eleven (11) of twenty (20) of the outstanding shares of corporate stock were represented * * * a majority of the stockholders were present" was used. Article I of Management Corporation's bylaws provides:

"Section 1. The majority *in number of stockholders* shall constitute a quorum at all meetings of the stockholders * * *. If, at such annual or special meeting, a majority in number of the stockholders shall not be represented, those present shall have the power to adjourn to a day certain."

It must be remembered that Peters was one of the incorporators of Management. The language found in the articles of incorporation and the bylaws was composed with his approval. It must be assumed that such language reflects his purposes and intentions at the time of incorporation. Such language therefore binds him at this time, as, of course, it binds any person acting as a director and officer of Management.

The bylaws are explicit and unambiguous concerning what constitutes a quorum at stockholders' meetings. See 19 Am.Jur.

2d, Corporations, § 954, p. 433. On April 12, 1963, the total number of stockholders in Management Corporation was fourteen. For a quorum to exist, at least eight stockholders had to be present, thereby constituting a "majority in number of the stockholders."

Only five stockholders were present in number in person or by proxy at the April 12, 1963, meeting. No quorum existed. The meeting was not competent to transact business, and it clothed the directors of Management with no authority to act upon the resolutions there adopted. "A quorum must be present before any business can be transacted at a stockholders' meeting." 19 Am.Jur.2d, Corporations, § 620, p. 139.

Following the April 12, 1963, meeting, the directors adopted a budget for fiscal year 1963-1964 sufficient in amount to cover the expenses of the activities allegedly approved at that meeting and proceeded to effectuate those projects, incurring considerable expense. The lower court modified the defendants' counterclaim, thereby holding the stockholders of Management liable for the following amounts, as shown in plaintiffs' specification of error:

(1) Salary increase to Tower Apartment caretaker,
William B. Young of $100.00 per month ............$ 1,200.00
(2) Wages to secretary A. E. Pohlod at $250.00
per month, for fiscal period ......................... 3,000.00
(3) Actual cost of sundeck remodeling ................... 24,314.47
(4) Actual cost of washing Tower Apartment
building exterior ........................................... 3,143.92
(5) Legal fees for defense of Tower Corporation in
appeal Cause No. 10809 ............................... 2,500.00

Total          $34,158.39

Testimony is conflicting regarding the actual value of the services performed by both caretaker Young and secretary Pohlod. The wages to be paid both shall be determined by the appointed receiver based upon the hours spent, the labor performed, and the customary wage paid for such services.

The directors had no valid authority to remodel the sundeck, such project stemming from the void stockholders' meeting of April 12, 1963. At the time the directors adopted the $100,000 budget for fiscal year 1963-1964, the estimated expense of such remodeling, the alleged purpose of which was to permanently fix a leaking roof, was $56,000. The argument that the directors had authority to institute such a project without specific approval of the stockholders to be assessed for its expense is beyond comprehension, not to mention the scope of powers outlined in the corporation's bylaws. The district court allowed as part of the budget to be assessed against the plaintiffs and other stockholders of Management, the actual cost of such remodeling, a sum in the amount of $24,314.47. There is testimony to the effect that such remodeling was of little benefit to the plaintiffs as apartment owners and stockholders of Management. Fixing a leaking roof is well within the scope of powers granted the directors in Management's bylaws, but doing so by the addition of another half-story to the apartment building at an actual expense of more than $24,000 is not.

While the district court found that the defendants, Duncan and Peters, appeared to have acted in good faith and in the exercise of honest judgment and discretion in roofing and enclosing the sundeck, we do not believe that the preponderance of the evidence can justify such a charitable approach. The district court also found: "The roofing and enclosing of the sun deck provided a permanent method, though not the most economical, of preventing leakage into apartments underlying the sun deck through a roof which had repeatedly but ineffectively been repaired and would require continued maintenance so long as it served the dual purpose of a roof and a deck.

Considering equity as to all parties it may be that insofar as the cost of the roof is concerned, if it did accomplish the purpose of preventing leakage into the apartment, some portion might be borne by Management.

We must bear in mind, however, this statement from

Thisted v. Country Club Tower Corporation, 146 Mont. 87, 405 P.2d 432:

"We are further of the opinion that under all the facts shown in evidence here and as heretofore referred to herein, an implied equitable servitude attached to the transfers of the apartments in question, requiring the use of the apartments for residential purposes only."

Since, in that case we have already found that Management is restricted in doing anything in or about the premises which would change the character of the apartment building to anything other than use for residential purposes, the burden rests upon the responsible directors to show that the new sundeck was in the nature of general repairs which had some relation to maintaining the character of the building as residential apartments, that is to say, that if, indeed, it be shown that the apartment building is enhanced in its value to the apartment owners, that some equitable part of the cost might be properly borne by Management.

From the record before us we are not able to make any evaluation as to whether or not some portion of the $24,314.47 would be attributable to these purposes, and the only way to resolve these issues within the guide lines hereinbefore stated is for the district court to hold a further hearing and make such determination. Unless the district court determines that some equitable portion of this expense should be borne by Management the entire cost must be shouldered by those responsible for it.

"The directors and officers of a corporation may be held liable to it for loss or injury consequent upon their unauthorized acts * * * they will be required to make good the loss out of their private estates." 19 Am.Jur.2d, Corporations, § 1274, p. 681. Liability rests upon common-law rule which renders every agent liable who violates his authority.

Testimony shows that the washing of the exterior walls of Tower Apartment Building, although perhaps premature, did add some beauty to the building, and therefore did benefit the

stockholders of Management. The expense of this project is therefore allowed.

It is perfectly clear to this court that, although named as a party defendant in this case and in Cause No. 10809, Management was and is a nominal and passive defendant. It is the defendant Peters who, acting through and controlling Management as one of its directors, is the primary source of contention. It is Peters, and not Management, who was unsuccessful in Cause No. 10809. It is Peters, not Management, who has been unsuccessful in this litigation. Since the legal expenses for defense in both actions was primarily the defense of Peters himself and his actions as a director of Management, he must bear the burden of such expense. It must be remembered that Management is a non-profit corporation. Permitting it to assume the liability for legal fees is, in reality, charging such expense to the plaintiffs since they are stockholders in Management and must be assessed for its liabilities. As the plaintiffs contend, this results in a direct conduit charge of the attorney fees for the unsuccessful litigants against the successful litigants.

For the above reasons, this cause is remanded to the district court with directions to appoint a receiver clothed with complete control over Management and authority to operate that corporation within the scope of its articles of incorporation and bylaws and for such further proceedings as herein required and as may be necessary, not inconsistent with this opinion.

Plaintiffs-appellants to recover their costs on this appeal.

MR. JUSTICES ADAIR, DOYLE and CASTLES and THE HONORABLE GUY C. DERRY, District Judge, sitting in place of MR. JUSTICE JOHN C. HARRISON, concur.