No. 81-309

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

———————————

MELVIN L. FOX,

Plaintiff and Respondent,

vs.

7L BAR RANCH COMPANY,
a Montana corporation,

Defendant and Appellant.

———————————

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Diane G. Barz, Judge presiding.

Counsel of Record:

For Appellant:

Moses Law Firm, Billings, Montana
Stephen C. Moses argued, Billings, Montana
Charles E. Snyder, Billings, Montana

For Respondent:

Overfelt Law Firm, Billings, Montana
Lee Overfelt argued and Sidney P. Kurth argued,
Billings, Montana

———————————

Submitted: March 2, 1982

Decided: May 13, 1982

Filed MAY 1 3 1982

_Thomas J. Kearney_
_____
                              Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is an appeal from a judgment and order rendered on May 26, 1981, in the Thirteenth Judicial District, Yellowstone County. Plaintiff Melvin Fox brought this nonjury action as an individual shareholder to dissolve and liquidate the defendant family Montana corporation, 7L Bar Ranch. The District Court ordered the dissolution of the corporation and the appointment of a receiver. This order was based on two propositions. First, the shareholders in the 7L Bar Ranch Corporation had a deadlock in voting power and had failed for a period of at least three consecutive annual meetings to elect successor directors whose terms had expired or would have expired upon election of their successors, in violation of section 35-1-921(1)(a)(iii), MCA. Secondly, the court found oppressive conduct by the members of the board of directors toward Melvin Fox in violation of section 35-1-921(1)(a)(ii), MCA. The District Court ordered liquidation of the 7L Bar to take place pursuant to sections 35-1-922, MCA through 35-1-930, MCA. Defendant appeals, raising the following issues:

1. Whether a motion to dismiss or a directed verdict should have been granted because the matter before the court was res judicata?

2. Whether a motion to dismiss or a directed verdict should have been granted because the plaintiff admitted to "unclean hands?"

3. Whether a motion to dismiss or a directed verdict should have been granted because the plaintiff did not prove his case?

4. Whether the District Court erred in admitting, over objection for lack of relevancy, the corporate minutes and

-2-

financial statements of Fox Land & Cattle Co. and Fox Ranches, Inc., which were not parties to the action and were not mentioned in the complaint or amended complaint?

5. Whether the court erred by finding "oppression" on the part of defendant?

6. Whether the court erred by finding that there existed "shareholder deadlock?"

7. Whether the court erred by ordering dissolution of defendant corporation?

FACTS

The 7L Bar Ranch Co. was incorporated in 1964 by William Fox and his two sons, Richard and Melvin. Upon William's death, and the subsequent probate distribution of his estate, the shareholders in the 7L Bar Ranch were:

| | |
|---|---|
| Melvin Fox | 1,500 shares |
| Richard Fox | 1,499 shares |
| Lydia Fox (Richard and Melvin's mother) | 1 share |

They are also the directors and officers of this corporation which owns 17,600 acres of land--1,400 acres of it farmland, with the rest used for grazing. The farmland is worked by a tenant farmer on a sharecrop basis.

Melvin Fox is also a shareholder and director of a second family corporation, Fox Land and Cattle Co. The shareholder breakdown in that corporation is:

| Fox Land & Cattle Co. | | | |
|---|---|---|---|
| | Treasury Stock | 144 | shares |
| | Richard Fox | 678.5 | shares |
| | Melvin Fox | 678.5 | shares |
| | Lydia Fox | 2 | shares |
| | Sharon (Fox) Wolfe (Richard and Melvin's sister) | 600 | shares |
| | Marital deduction trust (Principle beneficiary is Lydia) | 925 | shares |

-3-

This corporation began in 1960, and is involved in the cattle and real estate business. Richard, Melvin, and Sharon are the directors and officers, with Richard the general manager.

A third related corporation is Fox Ranches, Inc., started in 1958. It owns a 14,463 acre cattle ranch near Two Dot. Its directors and officers are the same as the 7L Bar, their shares apportioned thusly:

| Fox Ranches, Inc. | | | |
|---|---|---|---|
| Lydia Fox | | 120 | shares |
| Melvin Fox | | 1,717.5 | shares |
| Richard Fox (General Manager) | | 1,760.5 | shares |

Melvin managed the ranch in Two Dot for about five years until 1972, when he moved to Denver because of disputes with his father. After his father's death in 1974, he returned to Montana to be co-personal representative of the estate with Richard. Difficulties that had long been brewing within the family developed further until both personal representatives were eventually removed. The present controversy stems from an apparent deep-seated animosity and its effect on the interlocking nature of the family corporations.

In 1967, the assets of the three corporations were combined in support of common loans. Fox Land and Cattle serves as the financing agent for the other two corporations. All income from the 7L Bar goes into Fox Land and Cattle's account, while 7L Bar maintains about a $430 balance. Fox Land and Cattle is the sole user of 7L Bar's grazing land, the leasing value of which has been appraised at $48,000. The actual annual amounts paid have ranged from $7,848 to $14,400.

Accordingly, Melvin claims that the 7L Bar is a "captive corporation." The cash flow of the corporation in which he has a 50 percent interest is controlled by one in which he has a 25 percent interest.

-4-

Since its inception the 7L Bar has not declared any dividends. Melvin has never received dividends or remuneration of any kind from the 7L Bar, nor have any of the other stockholders. He has, however, borrowed from the corporations. He has never received dividends or remuneration of any kind from the other two corporations, though both show retained earnings of over $400,000, and Fox Land and Cattle has cash assets that exceed $400,000.

Melvin brought this claim because he had pledged all his stock in the three corporations for $241,500 in loans to support various business activities. The bank threatens to call its loans because the stock has no real value for loan purposes. Richard has told the bank that he would purchase the stock in the event of a foreclosure of Melvin's loan.

The District Court found that the conduct of the shareholders of 7L Bar, namely Richard and Lydia, revealed calculated and planned oppressive conduct designed to deprive Melvin of his rightful portion of the corporate holdings and profits by making sure he had no access to them. Further, the District Court found that the actions of the directors have not been in the best interests of Melvin effectively depriving him of any voice in its management.

RES JUDICATA

This issue arises from a ruling made by the District Court during the probate of the William Fox estate. Melvin, as legatee, moved to have the corporations liquidated and distributed in cash or assets. The court denied his motion and ordered distribution to be made "in kind."

The probate court determination, it is argued, bars Melvin from obtaining a corporate dissolution or liquidation

in this case. The criteria to be used in determining whether an action is barred by res judicata are set out in S-W Co. v. John Wight, Inc. (1978), 179 Mont. 392, 405, 587 P.2d 348, 355, quoting from Smith v. County of Musselshell (1970), 155 Mont. 376, 378, 472 P.2d 878, 880:

> ". . . These criteria are: (1) the parties or their privies must be the same; (2) the subject-matter of the action must be the same; (3) the issues must be the same, and must relate to the same subject-matter; and, (4) the capacities of the persons must be the same in reference to the subject-matter and to the issues between them."

Regardless of Melvin's motives for seeking a liquidation during probate, the court's ruling there did not make the matter res judicata for the purposes of this action.

Of the four criteria set out above, an important one is the identity of issues. Harris v. Harris (1980), ___ Mont. __, 616 P.2d 1099, 1101, 37 St.Rep. 1696, 1699. In Brannon v. Lewis and Clark County (1963), 143 Mont. 200, 207, 387 P.2d 706, 710-11, this Court approved the following language from Phoenix Mut. Life Ins. Co. v. Brainard (1928), 82 Mont. 39, 44, 265 P. 10, 12: "Unless it clearly appears that the precise question involved in the second case was raised and determined in the former, the judgment is no bar to the second action."

Here, the question involved is whether, pursuant to statute, the corporation should be liquidated because of oppression and shareholder deadlock. That precise question was neither raised nor determined during probate proceedings. There, the court's decree of distribution, over Melvin's objection, was essentially an interpretation of the will. It is no bar to this action.

Furthermore, we are not convinced in this case by appellant's argument that judgment in the first of two suits

-6-

involving the same claim, demand, or cause of action bars not only all matters actually determined, but also every other matter which might have been litigated and decided as incident to or essentially connected therewith as a claim or defense. Western Baptist Home Mission Board v. Griggs (Ore. 1967), 433 P.2d 252, 254-55. See also State v. District Court (1925), 75 Mont. 122, 127, 242 P. 421, 423.

Under section 26-3-102, MCA:

"That only is deemed to have been adjudged in a former judgment which appears upon its face to have been so adjudged or which was actually and necessarily included therein or thereto."

In this case, oppression and shareholder deadlock were not matters which the probate court adjudicated. In fact, it would have been impossible for those issues to have been considered at that time. The rule concerning matters which "might have been litigated," "does not mean that matters that could not, in any state of case, have been determined in the first action will nevertheless be treated as having been determined by the judgment of that action." Phillips v. Big Sandy Co. (Ky. 1912), 149 S.W. 957, 959. Where two causes, although seeking the same relief, rest upon a different state of facts, the adjudication in the one constitutes no bar to a recovery in the other. County of Mobile v. Kimball (1881), 102 U.S. 691, 705, 26 L.Ed. 238, 242. See also Roberts v. Roberts (9th Cir. 1961), 286 F.2d 647, 651; Hustad v. Reed (1958), 133 Mont. 211, 224-25, 321 P.2d 1083, 1091; Hays v. Sturgill (Ky. 1946), 193 S.W.2d 648.

The issues regarding "unclean hands" and proof of the case raise considerations that do not lend themselves to individual analysis. We deal with them as they apply in the remainder of this opinion.

-7-

RELEVANCE OF DOCUMENTS

Appellant contends that the corporate minutes and financial statements of the other two family corporations should not have been admitted into evidence. We disagree.

> "Rule 401. Definition of relevant evidence. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant." M.R.Evid.

Here, it is of consequence to the issue of oppression to examine the documents in question. Considering the interrelationship of the three corporations, both in membership and in business dealings, it is difficult to imagine how they could be understood as independent entities. As we have noted, Fox Land and Cattle is the exclusive lessee of 7L Bar's grazing land, as well as its financing agent. If any claim of intercorporate manipulation resulting in oppression is to be established, and it was argued extensively in the lower court, then the records of all the corporations involved must necessarily be admitted. Those records reflect a history of joint operations. They are relevant and all relevant evidence is admissible, unless excepted by the constitution, statute or rules of court. Rule 402, M.R.Evid.

OPPRESSION

This action was brought pursuant to section 35-1-921, MCA which provides in pertinent part:

> "Power of court to liquidate assets and business of corporation - venue. (1) The district courts shall have full power to liquidate the assets and business of a corporation: '(a) in an action by a shareholder when it is established that:'
>
> " . . .
>
> "(ii) the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent . . ." (Emphasis added.)

-8-

It is derived from section 90 of the ABA Model Business Corporation Act. The ABA Comments, quoted in the Annotations to section 35-1-921, Vol. 4, state:

> "When there is a statutory grant of such a power there are still two factors with which one seeking dissolution must contend: (1) Courts have tended to construe the statutes as discretionary rather than mandatory, even though the language of the particular statute may appear to make it mandatory. (2) Courts have tended to look beyond the language of the statute and into the equities of the situation."

This Court construed the statute recently in Skierka v. Skierka Bros., Inc. (1981), ___ Mont. ___, 629 P.2d 214, 38 St.Rep. 754, stating that "[O]ppression may be more easily found in a close-held, family corporation than in a larger, public corporation." 629 P.2d at 221. The reason for such a rule is obvious. Shares in a closely held corporation are not offered for public sale. Without readily available recourse to the market place, a dissatisfied shareholder is left with severely limited alternatives if one group of shareholders chooses to exercise leverage and "squeeze" the dissenter out. See Exadactilos v. Cinnaminson Realty Co. (N.J. 1979), 400 A.2d 554, 560-61, and authorities cited therein, Tinney, Oppressive Conduct by Majority Shareholders, Directors, or Those in Control of Corporation," 5 POF2d 645, 652 (1975), O'Neal, Oppression of Minority Shareholders, § 2.15 (1975), O'Neal, Close Corporations (2d ed. 1971).

There are a number of definitions of "oppressive conduct" found in case law. In Application of Topper (1980), 433 N.Y.S.2d 359, 363-366, it is stated that "to a great extent, a definition of 'oppressive' depends on the special nature of close corporations" as understood by the statute, relevant commentators, and case law. Topper, supra, at 364.

-9-

Many courts hold that "the term oppression suggests harsh, dishonest or wrongful conduct and a visible departure from the standards of fairdealing which inure to the benefit of majority and to the detriment of the minority." Jackson v. St. Regis Apartments, Inc. (Mo.App. 1978), 565 S.W.2d 178, 183.

Some courts find it helpful to analyze the situation in terms of the "fiduciary duty" of good faith and fair dealing owed by majority shareholders to the minority. Fix v. Fix Material Co., Inc. (Mo.App. 1976), 538 S.W.2d 351, 358; Baker v. Commercial Body Builders, Inc. (Ore. 1973), 507 P.2d 387, 394, 56 A.L.R.3d 341, 351.

Topper, supra, at 365, states that "[B]oth O'Neal and other commentators have developed a definition for oppression in terms of 'the reasonable expectations of the minority shareholders in light of the particular circumstances of each case.' (33 Business Lawyer 873, 886; see, 55 Virginia Law Review 1043, 1064 [1969])."

Generally, it is agreed that "courts will proceed on a case-by-case basis." Skierka, supra, 629 P.2d at 221; Jackson, supra, 565 S.W.2d at 183; Fix, supra, 538 S.W.2d at 358. Because of the special circumstances underlying closely held corporations, courts must determine the expectations of the shareholders concerning their respective roles in corporate affairs. These expectations must be gleaned from the evidence presented. Exadactilos, supra, 400 A.2d at 561. That is the province of the District Court, which found here:

> "That the conduct of the shareholders of 7L Bar;
> namely Richard Fox and Lydia Fox, reveal calculated
> and planned oppressive conduct designed to deprive
> Melvin Fox of his rightful portion of the corporate
> holdings and profits by making sure Melvin has no
> access to them. (Finding of Fact No. 44.)

"That the actions of the directors, Lydia Fox and Richard Fox, have not been in the best interests of the owner of half the shares of the 7L Bar, Melvin Fox. The animosity between Melvin Fox and other members of his family holding stock in the three corporations dates back to 1972 when Melvin Fox left the family business to pursue other business endeavors. (Finding of Fact No. 45.)

"That Melvin Fox has been effectively deprived of any voice in management of the 7L Bar." (Finding of Fact No. 46.)

These findings, supported by the evidence, constitute a violation of Melvin's reasonable expectations as a shareholder. The interrelationship of the three corporations, with Fox Land and Cattle Company acting as financing agent for the other two, allows Richard Fox in particular to control "whether or not any other corporation in which Melvin Fox holds stock can make a profit." (Finding of Fact No. 34.) This power is especially pronounced in the 7L Bar, where Melvin owns 50 percent of the stock, but has yet to realize any monetary remuneration.

The 7L Bar is comprised principally of grazing land, of which Fox Land and Cattle Company has been the sole user since 1964. The reasonable value of the rental per year is approximately $50,000. (Finding of Fact No. 22.) Because of the policies of the majority of the board of directors of 7L Bar (Richard and Lydia Fox), rentals since 1977 have been:

| 1977 | $13,595. |
| 1978 | 9,325. |
| 1979 | 7,848. |
| 1980 | 14,400. |

(Finding of Fact No. 27.)

Such a policy violates the duty of good faith and fair dealing owed to Melvin as 50 percent owner of 7L Bar, and is demonstrably contrary to his reasonable expectations in that "after the death of William Fox, Melvin Fox requested that the grazing land be rented to a third party at its actual value." (Finding of Fact No. 19.)

-11-

Furthermore, no dividends have ever been declared by any of the corporations. O'Neal, in Oppression of Minority Shareholders, § 3.04, p. 62 (1975) states that "[I]n close corporations, dividend withholding is often applied when a minority shareholder is in financial straits and is highly dependent upon income from dividends." In footnote 1 to that section, he states:

> "Although dividend withholding is used as a squeezeout technique and is used in corporations of all sizes, this technique (indeed practically all squeeze techniques) is applied most frequently in close corporations '. . .Most of the abuses in the field of dividend policy have occurred among the smaller corporations, especially in cases where there is concentrated control in a single family.' Graham, Controlling Versus Outside Stockholders, 4 Va L Weekly Dicta Comp 111, 114 (1952-1953)."

Footnote 5 goes on to say that "[i]n timing squeeze-out attempts the majority benefits from the fact that in a close corporation, everyone usually knows everyone else's business, especially their financial circumstances."

It can be said here that the corporations are in a position to declare dividends, that the refusal to do so acts as a hardship on Melvin, and when considered in light of all other circumstances, that such refusal strengthens Melvin's argument that he is being squeezed. This, is a case where the cumulative effects of many acts and incidents constitute sufficient evidence of oppressive conduct to compel liquidation without a showing of inevitable ruin. Fix, supra at 358; Central Standard Life Insurance Company v. Davis (Ill. 1957), 141 N.E.2d 45, 50.

Additionally,

> ". . . the logic which supports judicial reluctance to interfere with dividend policies in large corporations does not apply to close corporations. Management in large corporations has no incentive to deny adequate dividends, for such a policy would

result in lowered stock prices and the danger of a proxy fight or a takeover. However, in close corporations the dividend policy often reflects the personal financial needs of the controlling shareholders, and no market exists to reflect the dissatisfaction of other shareholders with this policy. When it is also considered that in close corporations dividend withholding may be used by controlling shareholders to force out minority shareholders, the traditional judicial restraint in interfering with corporate dividend policy cannot be justified. 'In fact, it would not be too extreme to put the burden of proving the propriety of its dividend policy on the controlling shareholders.' Manne, Our Two Corporation Systems: Law and Economics, 53 Va L Rev 259, 280 (1967)." Quoted in O'Neal, supra, § 3.05, footnote 2, at 71-72.

Perhaps the most persuasive consideration in favor of dissolution here is that "[I]t is being increasingly realized that the relationship between the stockholders in a close corporation vis-a-vis each other in practice closely approximates the relationship between partners." Topper, supra at 364, Weiss v. Gordon (1969), 301 N.Y.S.2d 839. See also Application of Pivot Punch & Die Corporation (1959), 182 N.Y.S.2d 459, 462.

Again, O'Neal is instructive. Oppression of Minority Shareholders, § 7.14, footnote 7, at 521-22:

"See Illinois Rockford Corp. v. Kulp, 41 Ill2d 215, 222, 242 NE2d 228, 233 (1968); Tilley v. Shippee, 12 Ill2d 616, 623-624, 147 NE2d 347, 351-352 (1958). The enterprise before us is a 'close corporation' in the strictest sense, that is, one in which, regardless of the distribution of the shareholdings, 'management and ownership are substantially identical' . . . In such a case, it seems almost self-evident, the fiduciary obligation of the majority to the minority extends considerably beyond what would be its reach in the context of a larger or less closely held enterprise. Here the relationship between the shareholders is very much akin to that which exists between partners or joint venturers."

DEADLOCK

The statutory basis for this claim is also section 35-1-921, MCA, specifically that portion which provides for liquidation when it is established that:

-13-

". . . (iii) the shareholders are deadlocked in
voting power and have failed for a period which
includes at least two consecutive annual meeting
dates to elect successors to directors whose
terms have expired or would have expired upon
the election of their successors. . ."

It is well settled that, in addition to the bare statutory
requirements, there is a further burden of proving equitable
grounds for dissolution. Jackson v. Nicolai-Neppach Co.
(Ore. 1959), 348 P.2d 9, 21, ABA Comments, supra. Here,
there is substantial evidence to support the District Court's
finding of the requisite deadlock. That much is not seriously
in doubt.

As for equitable grounds, we find considerable guidance
in the recent decision of the Washington Supreme Court in
Henry George & Sons v. Cooper-George, Inc. (Wash. 1981), 632
P.2d 512. In its initial interpretation of a statute identical
to ours, that Court concluded that:

". . . once the requisite showing of the jurisdic-
tional requirements are met, the trial court, in
its discretion, shall determine whether there
exist equitable grounds for ordering dissolution
of the corporation. In so ruling, the trial court
should consider the seriousness of the deadlock
and whether the corporation is able to conduct
business profitably despite the deadlock. Moreover,
the trial court should consider whether such a
dissolution will be beneficial or detrimental to
all the shareholders, or injurious to the public.
For example, the court may consider such factors
as the length of time the company has been in
business, the stated purpose of the business, the
original incorporators, whether one shareholder has
shown a clear design to take over the business and
is in a financial posture to do so to the detriment
of other shareholders who may be injured financially
by tax consequences, what the market for sale and
purchase is at the instant time, whether the share-
holders are in a relatively equal bargaining position,
and whether it is in the best interests of all
the shareholders to leave them to find their own
solutions by one party buying out the others in
a fair market value situation rather than by a
forced sale. The determination by the trial court
will not be disturbed by an appellate court except
in clear instances of abuse of discretion." 632
P.2d at 517.

We find no such abuse of discretion here. In addition to the jurisdictional requirements of deadlock, there was also proof of oppression, itself an independent statutory ground for dissolution. When we consider the necessary overlapping of these issues, together with the importance of equitable considerations in a case-by-case analysis, a summary discussion of the equities in this case seems appropriate.

Much is made of Melvin's "unclean hands." By his own admission, he intentionally created the voting deadlock in order to effect a dissolution. As we have stated, technical satisfaction of the deadlock requirements is not enough to warrant dissolution. Therefore, regardless of Melvin's motives for seeking a dissolution, dissolution could not be ordered absent the underlying equitable grounds.

This is a case where control of a set of corporations, designed to be run by one person, brought to boil an already bitter family struggle between people with a demonstrated inability to get along.

After the death of his father, Melvin Fox had a reasonable expectation of sharing in his inheritance. That is what he was banking on when he took out the loans. In this particular case, a division of the 7L Bar would neither disrupt the business of a going concern nor do any injury to the public.

On the other hand, to disallow a division would greatly harm Melvin Fox by making him the victim of corporate formalities. There is no alternative adequate remedy. As this Court stated in Skierka, supra, oppression may be more easily found in a close-held, family corporation. 629 P.2d at 221. That opinion at 222 went on to quote from Thisted v. Tower Management Corporation (1966), 147 Mont. 1,

-15-

15, 409 P.2d 813, 821 that "[R]elief will be granted when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition." The equities clearly favor the respondent. Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

-16-