Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/09/2017 09:14 AM CDT

Dianne Jones, individually and on behalf
of McDonald Farms, Inc., a Nebraska
corporation, appellant, v. McDonald
Farms, Inc., a Nebraska corporation,
et al., appellees.

___ N.W.2d ___

Filed May 9, 2017.   No. A-15-777.

1. **Actions: Equity: Accounting.** A derivative action which seeks an accounting and the return of money is an equitable action.
2. **Actions: Equity: Corporations.** An action seeking corporate dissolution is an equitable action.
3. **Equity: Appeal and Error.** In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
4. **Corporations: Courts.** Although the Business Corporation Act gives the courts the power to relieve minority shareholders from oppressive acts of the majority, the remedy of dissolution and liquidation is so drastic that it must be invoked with extreme caution.
5. **Corporations.** The ends of justice would not be served by too broad an application of the authority to dissolve and liquidate a corporation under the Business Corporation Act, for that would merely eliminate one evil by the substitution of a greater one—oppression of the majority by the minority.
6. ____. A corporation is not required to pay dividends to its shareholders.
7. **Corporations: Stock.** Stock transfer restrictions are generally enforceable under Nebraska law unless they are unreasonable.
8. ____: ____. A stock restriction provision providing for book value as determined by independent certified accountants for a company in

accordance with generally accepted accounting principles is sufficiently certain to be enforced.

9. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Hamilton County: Rachel A. Daugherty, Judge. Affirmed.

Andre R. Barry and Jonathan J. Papik, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellant.

Daniel M. Placzek, of Leininger, Smith, Johnson, Baack, Placzek & Allen, for appellees.

Moore, Chief Judge, and Riedmann and Bishop, Judges.

Riedmann, Judge.

## INTRODUCTION

A minority shareholder of a closely held family farm corporation brought an individual and a derivative action against the corporation and the majority shareholders claiming breach of fiduciary duty, misappropriation of corporate assets, and corporate oppression. Essentially, the minority shareholder took issue with the corporation's failure to pay dividends, its refusal to purchase her shares at a price she thought was fair, and its payment of commodity wages to the majority shareholders. Following a bench trial, the district court for Hamilton County entered judgment in favor of the corporation and majority shareholders. Finding that the minority shareholder failed to prove oppressive conduct, misapplication or waste of corporate assets, or illegal conduct by the majority shareholders, we affirm.

## BACKGROUND

McDonald Farms, Inc., was incorporated in 1976 by Charles McDonald and Betty McDonald. Charles and Betty were the parents of four children: Donald McDonald, Randall McDonald, Dianne Jones, and Rosemary Johns (Rosemary).

Donald and Randall began farming with Charles in the mid-1970's. Charles resigned as president of the corporation in 1989, at which time Randall became president and Donald became vice president. At the time McDonald Farms was incorporated, Charles and Betty held majority interests in the corporation and Donald and Randall each held a minority interest. Upon Betty's death in 2010, her shares were devised equally to her four children. In June 2012, Charles gifted his stock equally to Donald and Randall. As a result, Donald and Randall each currently own 42.875 percent of the shares and Jones and Rosemary each own 7.125 percent of the shares. Charles passed away in March 2014.

McDonald Farms' assets include approximately 1,100 acres of irrigated farmland and dry cropland. Since 1991, McDonald Farms has leased its land to two corporations: D & LA Farms, Inc., a corporation owned by Donald and his wife, and R & T Farms, Inc., a corporation owned by Randall and his wife. The land is leased on a 50-50 crop share basis, and Donald and Randall perform the farming duties such as planting, harvesting, and selling the crops.

McDonald Farms was initially incorporated as a subchapter S corporation under the Internal Revenue Code, but in 1993, Charles decided to convert it to a subchapter C designation. A subchapter C corporation pays its own taxes and is treated as an entity separate from its stockholders. Phillip Maltzahn, who has worked as McDonald Farms' certified public accountant since 1990, testified that he recommends that farmers put their farming operation under a C corporation but leave the land out of the corporation.

According to Maltzahn, as a C corporation employee, a farmer should receive wages for his work in planting, harvesting, and selling crops. There are two ways for an employee to receive wages from the corporation: cash, which would be subject to Social Security and Medicare taxes, or commodity wages. Commodity wages are paid by transferring grain or another such commodity from the corporation to the employee,

and at the time of the transfer, a wage is created. It is the corporation's choice whether to pay wages in cash or commodities, but if it chooses commodities, the corporation avoids paying Social Security and Medicare taxes. Maltzahn's recommendation is that the farming corporation pay its employees via commodity wages. He said that it is not unusual for farmers to be paid in commodity wages in central Nebraska and that in fact, "[a]ll of [his] farm clients do that."

Maltzahn explained that when Charles converted McDonald Farms to a C corporation, Charles' desire was to pay as little in taxes as possible in order to build the size of the corporation. Because the corporate tax rate on the first $50,000 of net income is 15 percent, Maltzahn's goal, and Charles' goal, was to keep the corporation's annual taxable income at $50,000. According to Maltzahn, all shareholders benefit from a C corporation designation because the book value for the corporation increases each year by $50,000, minus the 15-percent federal tax liability. Maltzahn testified that he works for at least 100 other C corporations and that they all share the same goal of keeping net income around $50,000 annually in order to take advantage of the 15-percent tax rate. He said that planning to reduce taxable income takes a lot of tax planning, including timing business functions such as paying crop inputs, replacing assets, and paying commodity wages.

According to Maltzahn, Charles could have received compensation every year he ran the corporation, but he did not because he wanted to keep the cash in the corporation and grow it as large as possible. Donald and Randall also could have taken annual compensation for working for McDonald Farms since the 1970's, but they did not. However, McDonald Farms paid Charles commodity wages worth $10,019 in 2004 and $8,355 in 2005. Then in 2010, 2012, and 2013, grain prices were high, and McDonald Farms needed to reduce its income, so it again decided to pay commodity wages. In 2010, prior to Betty's death, Charles received 13,100 bushels of corn at a value of $50,173. Although Donald and Randall

were minority shareholders at the time, they received no profits. In June 2012, Donald and Randall became majority shareholders and they, along with Charles, each received 10,000 bushels of corn worth $77,100 for that year. In 2013, Charles received 21,667 bushels of corn valued at $157,200, and Donald and Randall each received 16,667 bushels of corn worth $120,000.

When considering the number of years Charles, Donald, and Randall worked for the corporation, Maltzahn did not believe the commodity wages they have been paid were disproportional. He said the commodity wages paid to Charles, Donald, and Randall in 2010, 2012, and 2013 were reasonable because the amount of unpaid wages accrued since 1976 was much larger than the actual amounts paid. Maltzahn said that McDonald Farms was not legally obligated to pay wages to Charles, Donald, and Randall, but it was optional for the corporation to do so. He recommended the corporation do so, however, as part of its tax planning strategy. Jones' expert, Christopher Scow, had no opinion as to whether the commodity wages paid were appropriate.

Maltzahn also explained that paying compensation via commodity wages in the years after the compensation is earned does not fit the definition of deferred compensation as that term is used in the Internal Revenue Code. Under the code, deferred compensation means compensation earned in 1 year is spread out and paid over multiple years so it falls under a lower tax bracket and the employee pays less taxes. To the contrary, McDonald Farms took income earned over multiple years and paid it in a lump sum in 1 year, a strategy which works as a tax detriment to the employees because their tax bracket is higher in the years the income is actually paid.

Under McDonald Farms' articles of incorporation, before selling, giving, or transferring any shares of stock, a shareholder must first offer the shares to the board of directors for purchase by the corporation "at the book value of said stock as determined by the books of the corporation by regular and

usual accounting methods." In January and August 2012, Jones offered to sell her shares to the corporation for $240,650. She claimed the price offered was the fair market value of the shares based on a December 2010 valuation report prepared by a certified public accountant for purposes of Betty's estate. Donald and Randall declined Jones' offer, but offered to purchase her shares for $47,503.90, a sum which represented the shares' book value as of December 2011 minus $6,000 which they claimed was lost by the corporation due to Jones' failure to return a form to the Farm Service Agency. At one point, Donald and Randall offered Jones more than book value for her shares, but no agreement was ever reached.

Jones commenced this action on April 1, 2013. She sought an accounting, damages for breach of fiduciary duty and conflicting interest transactions, and judicial dissolution of the corporation based on oppressive conduct, misapplication and waste of corporate assets, and illegal corporate conduct. Trial was held in January and February 2015, and the district court subsequently issued an order denying Jones' requests for relief. Relevant to this appeal, the district court found that the corporation's subchapter C designation and tax strategy, the payment of commodity wages, and the corporation's purchase of expensive equipment were not unreasonable or inappropriate. In addition, the court determined that the failure to purchase Jones' shares at her requested price did not establish oppressive conduct. Jones now appeals to this court.

## ASSIGNMENTS OF ERROR

Jones claims the court erred in failing to dissolve the corporation under Neb. Rev. Stat. § 21-20,162 (Reissue 2012) because Donald and Randall (1) denied her any economic benefit from her shares while attempting to force her to sell her shares below their fair value, (2) misapplied and wasted corporate assets by making improper payments to themselves and Charles, and (3) acted illegally by taking improper deductions for payments to themselves and Charles. She also alleges

the court erred by not requiring Donald and Randall to return to the corporation improper payments directed to themselves and Charles to reduce the corporation's net income and in failing to recognize its power to require Donald and Randall to pay her fair value for her corporate shares.

## STANDARD OF REVIEW

[1,2] A derivative action which seeks an accounting and the return of money is an equitable action. *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001). An action seeking corporate dissolution is also an equitable action. *Id*.

[3] In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## ANALYSIS

Although Jones' complaint asserted four causes of action, on appeal, she only challenges certain decisions made by the district court. She asserts that the court erred in failing to provide a remedy pursuant to § 21-20,162 for corporate oppression, misapplication and waste of corporate assets, and/or illegal conduct. She asks that we remand this cause to the district court with directions ordering Donald and Randall to purchase her shares for fair value. We decline to do so, because we agree with the district court that Jones was not entitled to a remedy under § 21-20,162.

[4,5] At the time this action was commenced, the Business Corporation Act provided in relevant part:

[T]he court may dissolve a corporation:

. . . .

(2)(a) In a proceeding by a shareholder if it is established that:

. . . .

(ii) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent; [or]

. . . .

(iv) The corporate assets are being misapplied or wasted.

§ 21-20,162. Although the Business Corporation Act gives the courts the power to relieve minority shareholders from oppressive acts of the majority, the remedy of dissolution and liquidation is so drastic that it must be invoked with extreme caution. See *Woodward v. Andersen, supra*. The Supreme Court has stated that the ends of justice would not be served by too broad an application of the statute, for that would merely eliminate one evil by the substitution of a greater one—oppression of the majority by the minority. *Id.*

Through this action and her arguments on appeal, Jones is essentially challenging McDonald Farms' tax strategy. Rather than attempting to reduce net taxable income to $50,000 per year in various ways such as paying commodity wages and timing the purchase of new assets, Jones argues the corporation should maximize its income and pay dividends to its shareholders. She claims its failure to do so constitutes oppressive conduct, misapplication or waste of corporate assets, and/or illegal conduct. The evidence presented at trial established that there is nothing inherently inappropriate about McDonald Farms' tax strategy or decision not to pay dividends.

[6] A corporation is not required to pay dividends to its shareholders. See Neb. Rev. Stat. § 21-2050(1) (Reissue 2012) (board of directors *may* authorize and corporation *may* make distributions to its shareholders subject to certain restrictions). The articles of incorporation specifically make payment of dividends discretionary. Jones argues, however, that the failure to pay dividends constitutes oppressive behavior. She claims that the corporation has over $13 million in

assets and no debt; therefore, it had the resources to pay a dividend.

The evidence reveals, however, that McDonald Farms has never paid dividends. Instead, management has chosen to operate the business in a manner that best reduces its taxation. Its accountant, Maltzahn, recommends farming corporations operate under a subchapter C designation with the goal of keeping taxable income around $50,000 in order to reduce its tax burden. Charles made the initial decision to select a subchapter C designation, and his desire was always to pay as little in taxes as possible in order to build the size of the corporation. Donald and Randall have continued to run the business as Charles had run it. Because Charles never paid dividends to shareholders, Donald and Randall never elected to do so either.

In order to reduce its taxable income each year, McDonald Farms strategically times the purchase of new equipment, the sale of crops, and the payment of commodity wages. Randall testified that although the corporation would strategically time major purchases, it never purchased assets for the sole purpose of reducing taxable income. In the several years leading up to this action, McDonald Farms replaced irrigation pivots, installed a new irrigation system, and replaced a "[grain] dryer and a leg." The expenditures were large, but as the district court determined, the evidence demonstrates that the purchases were thought out and necessary. The irrigation pivots replaced equipment that was more than 30 years old. The irrigation system was purchased after a drought year in which water restrictions were discussed for the area, and McDonald Farms applied for and received grants toward its purchase. The evidence established that the new system would provide long-term benefits and cost savings to the corporation.

When commodity prices were high and net income would have exceeded the $50,000 limit, Charles paid himself commodity wages upon the recommendation of Maltzahn. This first occurred in 2004 and 2005, before Jones was a shareholder.

Donald and Randall were both minority shareholders at the time, and no profits were distributed to them. Again, in 2010, Charles paid himself commodity wages. At the time, Donald and Randall were still minority shareholders and Jones had not yet received her shares. Neither of the minority shareholders received profits in 2010. In mid-December 2010, Jones and Rosemary became minority shareholders, and in 2012, Donald and Randall became majority shareholders. In 2012 and 2013, commodity wages were paid to Charles, Donald, and Randall.

As Maltzahn explained, payment of commodity wages is common for farming corporations, and although the amount paid in wages was determined by the corporation's desire to reduce its income to $50,000, Maltzahn was not concerned that the wages paid were unreasonable or excessive when considering the number of years Charles, Donald, and Randall had worked without pay. The payments equate to $302,747 to Charles and $197,100 each to Donald and Randall for their 35-plus years of work. Jones' own expert, Scow, could not opine whether the wages paid were appropriate, and he also conceded that an annual farm management fee of 7 percent to 10 percent of gross income would be reasonable. Maltzahn testified that using either the 7½-percent rate or the 10-percent rate, Donald and Randall still have not been fully compensated. Although the dissent states that "[t]he commodity wages paid to Randall, Donald, and Charles for alleged unpaid (and undocumented) past services are an unfair and unjustified business decision that was disguised as an acceptable tax reduction policy," no such opinion was offered at trial by any expert to contradict Maltzahn's testimony.

The only commodity payments made while Jones was a shareholder were the payments made in 2012 and 2013. The question before us is whether payment of those wages constitutes oppressive acts by the majority shareholders. Given Maltzahn's uncontroverted testimony that the payments were reasonable; the number of years Charles, Donald, and Randall

worked without compensation; and Scow's admission that an annual management fee of 7 to 10 percent of gross income would be reasonable, we find nothing illegal, fraudulent, or oppressive in either the decision to pay commodity wages or in the amount of the wages paid.

The dissent argues that the payment of commodity wages denies the minority shareholders their reasonable expectations of sharing in the profits. It relies upon *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663 (Iowa 2013), in which the Iowa Supreme Court adopted the reasonable expectations of a minority shareholder standard to assess minority shareholder claims of oppression. It is questionable whether the reasonable expectation standard applies to minority shareholders who have acquired their interest by gift or devise, because the test involves assessing the reasonable expectations held by minority shareholders "'in committing their capital to the particular enterprise.'" See, e.g., *Edenbaum v. Schwarcz-Osztreicherne*, 165 Md. App. 233, 256, 885 A.2d 365, 379 (2005); *Ford v. Ford*, 878 A.2d 894 (Pa. Super. 2005); *Mueller v. Cedar Shore Resort, Inc.*, 643 N.W.2d 56 (S.D. 2002). See, also, *Gimpel v. Bolstein*, 125 Misc. 2d 45, 477 N.Y.S.2d 1014 (1984) (explaining reasonable expectations test was not entirely appropriate where corporation had been in existence for many years and complaining shareholder had received share by gift or devise).

To the extent the reasonable expectations test may apply, "'oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the [minority shareholder's] decision to join the venture.'" *Matter of Wiedy's Furniture Clearance Center Co.*, 108 A.D. 81, 84, 487 N.Y.S.2d 901, 903 (1985). Accordingly, even *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 209-10, 645 P.2d 929, 933 (1982), relied upon by the dissent, states that when defining oppression using the reasonable expectation standard, it must be done "'in light of the

particular circumstances of each case'" and that "'courts will proceed on a case-by-case basis.'" The court in *Fox* continued, stating that "[b]ecause of the special circumstances underlying closely held corporations, court[s] must determine the expectations of the shareholders concerning their respective roles in corporate affairs. These expectations must be gleaned from the evidence presented. . . . That is the province of the District Court . . . ." *Id*. at 210, 645 P.2d at 933.

The Montana Supreme Court addressed the reasonable expectations of a minority shareholder who claimed it was oppressive for the closely held corporation to deny dividends. Rejecting the argument, the court stated:

> [Plaintiff] complains that the Corporation pays no dividends, but he is well aware from his long involvement with the Corporation that it has historically not paid dividends. While failing to issue dividends to shareholders could be an oppressive tactic, the mere non-issuance of dividends is not oppressive in all circumstances. Here, the District Court concluded that neither [minority shareholder] had any capital investment—having received their shares as gifts—which would lead to an expectation of profits . . . .

*Whitehorn v. Whitehorn Farms, Inc.*, 346 Mont. 394, 401, 195 P.3d 836, 842 (2008).

Likewise, in the present case, Jones did not have any capital investment—her shares were devised to her by her mother, Betty. She received her shares in December 2010 and sought to have the corporation buy her shares out in January 2012. During this 13-month duration, no commodity wages were paid, which makes suspect the dissent's claim that her reasonable expectations were violated as a result of payment of commodity wages. And based upon the history of the corporation, the minority shareholders had no reasonable expectation that profits would be paid out to them. Never, in the history of this corporation that was established in 1976, has a minority shareholder ever been paid profits.

That is not to say that the majority shareholders can retain all profits to themselves if doing so constitutes oppression; indeed, after determining that the evidence did not establish that the majority shareholders deprived Jones of any return on her share, the district court cautioned that "[i]t is quite possible that continuation of payment of commodity wages without the payment of dividends to shareholders would result in that finding, but based upon the evidence as was presented, the evidence at this time does not support a finding of oppression." This conclusion implies that the district court found Maltzahn's uncontroverted testimony credible that the amounts paid thus far as commodity wages were not disproportionate to back wages and, therefore, did not constitute oppressive behavior.

The dissent contends that payment of back wages in the form of commodity payments is "incredulous" in part because Donald and Randall were already "handsomely rewarded when they ultimately received 86 percent of a corporation with approximately 1,100 acres of farmland and other assets appraised at over $9 million in 2012." It claims the exclusion of profits to the minority shareholders "fails to consider the decision made by their parents to give each of the sisters a 7.125-percent share of the corporation. Presumably that decision was intended to confer some benefit on the sisters."

As correctly noted by the dissent, the value of the corporation was appraised at over $9 million when Jones was devised her 7.125-percent share in the corporation. The dissent attempts to shame Donald and Randall for the shares their parents obviously believed they deserved, stating:

> Receiving almost $4 million in farmland and other assets might be considered a fairly substantial "payment" for the brothers' efforts. The brothers have been generously rewarded for their loyalty to the family's farm operation, as signified by Charles' transferring his remaining stock to only Randall and Donald in June 2012.

But it disregards the fact that despite Jones' total lack of involvement in the family farm, her 7.125 percent equated to $641,250 in 2012 and continues to grow each year. It is not within the province of this court to judge the estate planning decisions of Charles and Betty. And it is important to remember that Charles, one of the incorporators of McDonald Farms, not only acquiesced, but also initiated and partook in the decision to pay commodity wages to the majority shareholders as a tax planning strategy beginning in 2004 when he first paid wages to himself. Jones has the ability to realize the benefit her mother, Betty, intended to bestow on her via the buyout provision in the articles of incorporation, but Jones is dissatisfied with the buyout formula.

Jones asserts that the payment of commodity wages was illegal deferred compensation, but as Maltzahn explained, the wages paid to McDonald Farms' employees were actually the opposite of the Internal Revenue Code's definition of deferred compensation.

Jones also claims that the corporation's refusal to pay fair value for her shares constitutes corporate oppression. The price Jones believes is fair for her shares is based on a valuation of McDonald Farms that had been performed for Betty's estate. However, McDonald's Farms' articles of incorporation require that shares be offered for sale to the corporation "at the book value of said stock as determined by the books of the corporation by regular and usual accounting methods." Jones relies on *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663 (Iowa 2013), to argue that we should disregard the provision contained in the articles of incorporation because it does not provide fair compensation for minority shareholders. We agree with Jones that in *Baur*, the Iowa Supreme Court found that the specific provision in the bylaws of a closely held farming corporation regarding stock transfers was problematic because it potentially prevented the minority shareholder from receiving fair value for his shares. However, we note the limitations of *Baur*, in that the court expressed no view on whether the

price offered was outside the range of fair value and incompatible with the minority shareholder's reasonable expectations given a history of not having received dividends for several decades.

In *Baur v. Baur Farms, Inc., supra*, the original corporate bylaws included restrictions on transfers of the company's stock and established a stock redemption price of $100 per share. The bylaws were amended in 1984 to include a buyout provision. Under this provision, a shareholder wishing to sell his shares was required to first offer to sell them to the corporation or the other shareholders. If a different price was not agreed upon, the purchase price of the stock was set at the "'book value per share of the shareholders' equity interest in the corporation as determined by the Board of Directors, for internal use only, as of the close of the most recent fiscal year.'" *Id.* at 665. The 1984 amendment established a book value of $686 per share.

The minority shareholder attempted to sell his stock to the corporation for more than 20 years, but the parties were never able to come to a mutually agreed upon price in order to abide by the provision in the bylaws. Thereafter, the minority shareholder filed suit, requesting, among other forms of relief, payment of the fair value of his ownership interest. On appeal, the Iowa Supreme Court concluded that the record was not adequate to determine whether the price offered by the corporation for the purchase of the minority shareholder's shares was "so inadequate under the circumstances as to rise—when combined with the absence of a return on investment—to the level of actionable oppression." *Id.* at 677.

With respect to the stock transfer restriction contained in the bylaws, the Iowa Supreme Court noted that the parties had not been able to come to a mutually agreed-upon price, and the book value option was also problematic from the minority shareholder's perspective. Notably, the price per share ratified in 1984 was never formally revisited or revised, and according to the Iowa Supreme Court, the language of the book value buyout provision failed to address several important

questions: (1) whether book value must be set by express resolution of the board or may be determined from an inspection of the books of the corporation without formal action by the directors or shareholders; (2) whether annual determination of the book value for purposes of the bylaw provision was intended; and (3) whether the board, when setting the book value under the provision, must use asset values that are reasonably related to actual or fair market values and be based on generally accepted accounting principles. Essentially, the parties in *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663 (Iowa 2013), could not agree on how to calculate the book value of the stock under the corporation's bylaws.

The issue in the present case is different. Contrary to *Baur*, the issue in the instant case is not how to calculate the book value of Jones' shares, but, rather, whether limiting redemption to book value is so disproportionate to fair value as to constitute corporate oppression. The provision in McDonald Farms' articles of incorporation provides that the shares must be offered to the corporation for purchase at the book value of the stock as determined by the books of the corporation by regular and usual accounting methods. So the three questions raised by the provision in *Baur v. Baur Farms, Inc., supra*, are not present here, and Jones does not challenge the method by which book value is calculated. She does not contend that Donald and Randall's offer to buy her shares at $47,503.90 does not actually constitute book value. Instead, she claims that the book value of her shares is not fair, because the land owned by McDonald Farms was appraised at over $13 million. However, Maltzahn testified that book value includes capital stock, paid-in capital, and retained earnings. The real estate is included in the amount of paid-in capital only to the extent of its cost basis. To include the appreciation of the land in Jones' buyout number would require us to disregard the plain language of the transfer restriction.

[7,8] Stock transfer restrictions are generally enforceable under Nebraska law unless they are unreasonable. See, Neb.

Rev. Stat. § 21-2046 (Reissue 2012); *Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 720 N.W.2d 886 (2006); *Elson v. Schmidt*, 140 Neb. 646, 1 N.W.2d 314 (1941). The Nebraska Supreme Court has determined that a stock restriction provision providing for book value as determined by independent certified accountants for a company in accordance with generally accepted accounting principles was sufficiently certain to be enforced. See *F.H.T., Inc. v. Feuerhelm*, 211 Neb. 860, 320 N.W.2d 772 (1982).

In *Elson v. Schmidt, supra*, after determining that a stock restriction requiring the stockholders to first offer the stock to the remaining stockholders at par value was not an unreasonable restraint upon the transfer of property, the Nebraska Supreme Court enforced the restriction as written. In doing so, it stated: "There is no merit in the contention of the appellant as to fraud, and his further contention that the amount received for the stock is unconscionable, as compared with the offer made by him is not an issue, when [the restriction] is held to be a valid contract." *Id*. at 653, 1 N.W.2d at 317.

In the present action, the stock transfer restriction is a valid contract; in accepting the stock, the shareholders agreed to the provisions contained in the articles of incorporation as to the value of redemption. Jones argues that the articles of incorporation should not govern the purchase of shares because Donald and Randall did not comply with them when Charles transferred his shares to them instead of first offering them to the corporation for purchase. We note, however, that Jones received her shares as a result of a testamentary devise upon Betty's death, an event that likewise would have required that they first be offered to the corporation for purchase.

Having found that the transfer restriction is enforceable as written, we conclude that Donald and Randall did not engage in oppressive conduct in rejecting Jones' offers.

[9] Based on the foregoing, we find that the district court did not err in finding insufficient evidence to establish oppressive conduct, misapplication or waste of corporate assets, or

illegal conduct. Jones also assigns that the district court erred in failing to require Donald and Randall to return to McDonald Farms the commodity wages paid to themselves and Charles and in failing to recognize its power to require Donald and Randall to pay fair value for her shares. However, we need not address those arguments, because we have determined that the payment of commodity wages was not inappropriate and that Donald and Randall were not obligated to purchase Jones' shares at her requested price. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Doty v. West Gate Bank*, 292 Neb. 787, 874 N.W.2d 839 (2016). Accordingly, we affirm the district court's decision.

## CONCLUSION

We conclude that the district court did not err in finding that Jones failed to establish a basis for judicial dissolution of McDonald Farms based on oppressive conduct, misapplication or waste of corporate assets, or illegal conduct. We therefore affirm.

AFFIRMED.

Bishop, Judge, dissenting.
Shareholders may reasonably expect to share in a corporation's profits. However, in this case, the majority shareholders intentionally excluded the minority shareholders from receiving any portion of $628,500 in corporate profits (from 2012 and 2013) under the guise of "[c]ommodity [w]ages" they claimed were owed to them for their unpaid past services to McDonald Farms. This claim is incredulous for several reasons. First, there was no agreement between McDonald Farms and the majority shareholders to pay any wages for any work performed as an officer, director, or employee. Second, to the extent the brothers were entitled to some added benefit over their sisters because of their personal involvement with the corporation, they were handsomely rewarded when they ultimately received 86 percent of a corporation with approximately

1,100 acres of farmland and other assets appraised at over $9 million in 2012. Receiving almost $4 million in assets each might be considered a fairly substantial catch-up "payment" for the brothers' efforts. Finally, the notion that the commodity wages had to be paid as part of a tax strategy is not persuasive in light of reasons one and two. Although the district court concluded that the "evidence at this time does not support a finding of oppression," the court also stated, "It is quite possible that continuation of payment of commodity wages without the payment of dividends to shareholders would result in that finding . . . ." I dissent because the evidence does support finding the payment of commodity wages constituted oppressive conduct, and I would reverse, and remand for the district court to consider ordering equitable alternatives to dissolution of the corporation, as discussed later.

## EVIDENCE RELEVANT TO
## COMMODITY WAGES

*No Agreement or Other Documentation*
*to Support Compensation*
*for Past Services.*

There was no evidence of any agreement between McDonald Farms and any shareholder for the payment of wages as an officer, director, or employee. Randall and Donald both testified they had no expectation of receiving wages from McDonald Farms, and neither could account by recollection, nor by any documentation whatsoever, as to the amount of time spent on McDonald Farms' business as opposed to the time each worked for his own farming corporation. Each brother represented he was spending 100 percent of his time working for his own farming corporation (R & T Farms, Inc., and D & LA Farms, Inc.), as reflected in the tax returns, the brothers' joint venture agreement, and/or each brother's employment agreement with his own corporation. In fact, Donald acknowledged that devoting 100 percent of his time to D & LA Farms included the time that he spent on McDonald Farms, "because it was all part of

the same thing." Indeed, the actual farming of the land owned by McDonald Farms was done by Randall and Donald through their respective corporations. Instead of paying rent for the land, they simply shared the harvested crop on a 50-50 basis with McDonald Farms. McDonald Farms, in turn, provided irrigation equipment and grain bins, and it shared equally the costs for seed, fertilizer, and other expenses associated with the crop. Randall acknowledged that the "tenant" made decisions about when to plant and what seed to purchase.

Further, although Randall testified that he did not know whether Charles held any positions as an officer of McDonald Farms after his resignation as president in 1989, the schedule E in the 2009 and 2010 corporate tax returns provides for compensation of officers, and the schedule shows Charles, Betty, Randall, and Donald all listed as officers. The schedule E further shows that during both those years, Charles devoted 100 percent of his time to McDonald Farms, Betty devoted only 10 percent of her time, Randall devoted only 10 percent of his time, and Donald devoted only 10 percent of his time. Accordingly, the evidence shows that Charles was still primarily running the corporation at least until 2010 and that not a significant amount of Randall's or Donald's time was spent running McDonald Farms. Additionally, when Randall was questioned about what his responsibilities were with regard to managing McDonald Farms, he had difficulty describing his duties. The following colloquy took place:

[Counsel for Jones]: What were you doing on behalf of McDonald Farms when you became president?

[Randall]: Um, paying bills, whatever needed to be done, I did.

[Counsel for Jones]: What else needed to be done besides pay bills for McDonald Farms?

[Randall]: Whatever it took to operate the corporation.

[Counsel for Jones]: What, other than paying bills, did it take to operate the corporation?

[Randall]: Whatever it takes.

[Counsel for Jones]: Okay. Do you have anything specific in mind under "whatever it takes" other than paying bills?

[Randall]: To operate the corporation?

[Counsel for Jones]: Right.

[Randall]: No, I guess not.

[Counsel for Jones]: There's nothing that needs to be done to operate McDonald Farms other than pay bills?

[Randall]: Well, operate — do what — to operate McDonald Farms?

[Counsel for Jones]: Right.

[Randall]: Pay taxes. Um, yeah, I don't know what else to say, I guess.

[Counsel for Jones]: So in order to operate McDonald Farms, you need to pay taxes, correct?

[Randall]: Well, have to pay taxes, yes.

[Counsel for Jones]: And pay other bills?

[Randall]: Correct.

[Counsel for Jones]: And there's nothing else that needs to be done to operate McDonald Farms?

[Randall]: I'm sure there is.

[Counsel for Jones]: You're the president, right?

[Randall]: Right.

[Counsel for Jones]: Tell me what it is.

[Randall]: Whatever needs to be done.

Randall also testified that his mother, Betty, continued to keep the corporate checkbook even after Randall became president. Randall took custody of the corporate checkbook "[p]robably after [his father, Charles,] g[a]ve up his shares in 2012." Upon questioning from his own attorney, Randall indicated that as employees and officers of McDonald Farms, he and Donald serviced irrigation pivots, grain bins, and equipment. Randall said that he and Donald also spread fertilizer, purchased liability and crop insurance, and made sure McDonald Farms was participating in government programs. When asked how he knew when he was working for

McDonald Farms and when he was working for his own farming business, Randall said, "If I'm working on McDonald Farms' grain bins, their pivots, if I'm maintaining wells, engines, anything McDonald Farms owns, I'm working for McDonald Farms." When asked if he expected McDonald Farms to compensate him, Randall responded, "I guess I never thought about it a whole lot, so probably not." When asked how much more he thought he was owed in back wages, Randall said, "I have no idea." And when asked if he had even started to calculate that, Randall replied, "No," and he had "[n]o idea" whether he was done paying back wages to Donald and himself.

The accountant for McDonald Farms, Phillip Maltzahn, opined that the commodity wages paid to Charles, Randall, and Donald were reasonable "[b]ecause the amount of unpaid wage from 1976 through 2010, '11, '12, '13, would have been much, much larger than the actual amounts paid." Maltzahn acknowledged that he referred to the commodity wages as deferred compensation when his depositions were taken in 2014. He explained that his use of the deferred compensation terminology was to explain it was not a legal obligation for McDonald Farms to pay Randall and Donald, but that "[m]orally it was owed to them . . . ." Apparently, Maltzahn was not aware that deferred compensation had to be treated differently today than when he worked for the Internal Revenue Service in the 1970's. Maltzahn also admitted that commodity wages were not properly noted on the 2012 tax return and that nothing had been done to correct that—no amended return had been filed, nor was he planning to file one. He explained that filing an amended return was unnecessary, since there would be no net income increase because it would show additional income (commodity wages) but would also deduct the same amount. There was no testimony by Maltzahn regarding any kind of accounting record maintained to track past services rendered by Charles, Randall, or Donald, for which payment would later be expected.

*Brothers' Efforts Already*
*Compensated Through*
*Ownership Interests.*

Randall and Donald justified distributing commodity wages only to themselves rather than sharing the profits with their sisters because their sisters had not "done anything" for McDonald Farms. This explanation suggests that Randall and Donald believe they are entitled to take all the profits from the corporation due to their personal involvement with the family farming business. Randall testified:

> [Counsel for Jones]: And when you paid commodity wages to yourself, did you consider paying those out as dividends to the minority shareholders?
>
> [Randall]: No.
>
> [Counsel for Jones]: Why not?
>
> [Randall]: They weren't — they hadn't worked anything — it was a wage. It was back wages is what we did. They hadn't done anything for the corporation.
>
> [Counsel for Jones]: So you considered that was back wages, and they hadn't done anything for the corporation, so the shareholders weren't entitled to that?
>
> [Randall]: Correct.

This explanation, however, fails to consider the decision made by their parents to give each of the sisters a 7.125-percent share of the corporation. Presumably that decision was intended to confer some benefit on the sisters. The entitlement (to all profits) position further strains credulity in light of Randall and Donald together receiving 86 percent of the corporation's stock from their parents—a corporation appraised at over $9 million in 2012. Receiving almost $4 million in farmland and other assets might be considered a fairly substantial "payment" for the brothers' efforts. The brothers have been generously rewarded for their loyalty to the family's farm operation, as signified by Charles' transferring his remaining stock to only Randall and Donald in June 2012.

McDonald Farms owns approximately 1,100 acres of irrigated (pivot, gravity, and drip) and dry cropland with building improvements. Building improvements include a grain storage facility with an estimated capacity of 305,000 bushels, two Quonset buildings, three machine sheds, a barn, a garage, and a home. An appraisal in 2012 placed a value of $9,195,000 on the land, bins, and irrigation pivots. Randall acknowledged this to be "a fair number at the time [he] sat down with . . . Maltzahn in 2012." McDonald Farms generates revenue in one way—by leasing farmland, and it always leases that land to R & T Farms and D & LA Farms.

Despite being given 86-percent ownership of this $9 million entity, the brothers nevertheless suggest they are entitled to receive additional payments for past unpaid services given to the corporation; services for which they can barely describe and have no agreements or records to support.

*Tax Strategy Cannot Justify Random,*
*Unsupported Payments to Only*
*Majority Shareholders.*

The explanation provided by the majority shareholders and the corporation's accountant for how they arrived at the amount of commodity wages to be paid had nothing to do with any accounting of time and services provided to the corporation by each shareholder; rather, it was solely about paying out any profits to reduce the corporation's taxable income to $50,000. McDonald Farms was in the business of leasing farmland, with its primary asset being the corporation's ownership of approximately 1,100 acres of land; the corporation had no debt. In order to reduce McDonald Farms' taxable income to $50,000 each year, excess profits were used to purchase new equipment, prepay expenses for the next year, and pay commodity wages.

When Randall was asked about paying his father, Charles, $50,173 in commodity wage payments in 2010, the following exchange took place:

[Counsel for Jones]: That payment was not based on a calculation of [Charles'] contributions to the management of the company?

[Randall]: I don't know how [Maltzahn] c[a]me up with it.

[Counsel for Jones]: So you didn't come up with the calculation?

[Randall]: No.

[Counsel for Jones]: You didn't make a decision about what [Charles] had contributed to the company in making that payment?

[Randall]: No.

[Counsel for Jones]: And the same would be true of the commodity wage payments that were made to [Charles] in 2012?

[Randall]: Correct.

[Counsel for Jones]: You didn't make any calculation on what he had contributed to the company to justify those payments?

[Randall]: Correct.

[Counsel for Jones]: Now, the commodity wage payments to you and Don in 2012 and 2013 are the same, right?

[Randall]: Correct.

[Counsel for Jones]: And when you made those payments, you did not consider the specific services that each of you provided to McDonald Farms?

[Randall]: It was wages for McDonald Farms — from McDonald Farms. I don't know if we specified specific things that we did to earn them wages.

. . . .

[Counsel for Jones]: You didn't have any time sheets or other records of work actually performed when you did this, did you?

[Randall]: No.

[Counsel for Jones]: You didn't look at what others who provide similar services for other corporations did, did you?

[Randall]: No.

[Counsel for Jones]: Did you consider what an independent investor would consider reasonable in terms of what the commodity wages were?

[Randall]: No.

[Counsel for Jones]: You didn't consider what Rosemary or [Jones] might think of the commodity wages?

[Randall]: No.

[Counsel for Jones]: Certainly didn't consult with them?

[Randall]: They don't know what we've done for the corporation.

[Counsel for Jones]: You didn't go to them and say this is what we've done and what we think we deserve?

[Randall]: No.

[Counsel for Jones]: And it didn't even cross your mind to do that?

[Randall]: No.

Randall acknowledged that if it looked like McDonald Farms was going to realize more than $50,000 in income, then he would sit down with the accountant and try to figure out ways to get the net income down to $50,000. The decision on how to do that was not based on any prior corporate planning; rather, the decisions appeared fairly random. Sometimes commodity wages were paid. Sometimes fertilizer was prepaid. And sometimes, new equipment was purchased. As an example, the 2009 profit and loss worksheet was showing the corporation's net income was likely to be $477,450 that year, so to get that net income down to $50,000, McDonald Farms bought a new "[grain] dryer and a leg" ($210,228), even though the brothers had planned to make that purchase through their corporations. While this purchase added value to McDonald Farms, it obviously was a significant personal

savings to the brothers by not having to make that investment through their own corporations. The same could be said for the irrigation systems purchased by McDonald Farms in 2012 ($174,043) and 2013 ($173,716). And although there is some merit to Jones' arguments about possible conflicts of interests between the brothers acting in their personal capacities for their own farming corporations versus acting in their capacities as majority shareholders of McDonald Farms when making these purchasing decisions, this dissent focuses only on the oppressive nature of the commodity wages.

## ANALYSIS

*Payment of Commodity Wages for*
*Undocumented Past Services*
*Is Oppressive Conduct.*

The majority states, "Through this action and her arguments on appeal, Jones is essentially challenging McDonald Farms' tax strategy." I do not see Jones' arguments being limited in this way. Although Jones does take issue with how the corporation's tax strategy deprives minority shareholders of any profits, she largely takes issue with how the corporation has elected to take corporate profits and distribute them as commodity wages (for past services) to some shareholders instead of paying dividends to all shareholders. Of the $628,500 paid in commodity wages from 2012 to 2013, each sister would have been entitled to 7.125 percent of those profits if they had been distributed as dividends. (Although Jones and her sister acquired their interest in the corporation upon the passing in 2010 of their mother, Betty, this dissent addresses only the 2012 and 2013 commodity wage distributions which were made when the brothers had become majority shareholders.)

Most of the testimony at trial was focused more on the payment of commodity wages for past services than it was on the equipment purchases or other expenses paid for by the corporation. Jones, for example, did not object to the corporation's

purchase of the irrigation pivots. She argues that when considering capital improvements, a corporation should also consider paying dividends. Further, any increase in the value of the corporation from capital improvements did not benefit her because Randall and Donald "have refused to pay her fair value for her shares." Brief for appellant at 27. Both she and her sister, Rosemary, testified they had not received any economic benefit from their shares in the corporation. Rosemary did, however, have the benefit of living "on the homeplace" which is located on McDonald Farms' land. She does not pay rent for the house, barn, and two lots there; however, she testified that it is "very stressful living there" because "they [presumably her brothers] don't want me there."

So the primary issue is not the general concept of trying to keep the corporation's taxable income at $50,000 to stay within the 15-percent tax bracket, as there are certainly equipment investments and prepaid business costs that improve the overall business operation and add value. Rather, the problem arises when an arbitrary figure is created to pay out remaining net income only to the majority shareholders, and that figure is based on accounting practices that were speculative (no agreements on past wages, no records of specific services rendered, no time records), or even nonexistent (commodity wages paid in 2012 were not reported on the corporation's tax return). So the issue is not by itself the goal of reducing the corporation's taxable income to $50,000; rather, it is whether Randall and Donald exercised their fiduciary duty of good faith and fair dealing with Jones and Rosemary when they made the decision to distribute profits only to themselves under the guise of commodity wages instead of distributing those profits in proportionate shares to all shareholders.

An officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders, and is treated by the courts as a trustee. *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001). Although the burden is ordinarily upon the party seeking an accounting to produce

evidence to sustain the accounting, when another person is in control of the books and has managed the business, that other person is in the position of a trustee and must make a proper accounting. *Id*. The burden of proof is upon a party holding a confidential or fiduciary relation to establish the fairness, adequacy, and equity of a transaction with the party with whom he or she holds such relation. *Id*. As noted in *Woodward*, once the fiduciary relationship between the parties is established and evidence is presented that certain transactions existed that allegedly breached a fiduciary duty, the burden shifts. In this case, the burden shifted to Randall and Donald to prove the fairness, adequacy, and equity of the commodity wage distribution to themselves and their father, Charles. In my opinion, they failed to meet this burden.

Randall and Donald failed to provide any reliable authority, nor a proper factual basis, to demonstrate the appropriateness or fairness in the distribution of commodity wages in the manner present here. The notion that majority shareholders can simply pay themselves any amount of money for past services without the existence of any agreement with the corporation, without any expectation that wages would ever be paid, and without any documentation or specificity of past services performed, belies the concept of fair dealing with other shareholders. It is clear the district court had some concern about the evidence presented, but was perhaps hesitant to compel dissolution of this family farming corporation. That is understandable. It has been widely observed that courts are reluctant to apply the drastic remedy of statutory dissolution, especially in proceedings by a shareholder; and because dissolution and liquidation is so drastic, it must be invoked with extreme caution. See *In re Invol. Dissolution of Wiles Bros.*, 285 Neb. 920, 830 N.W.2d 474 (2013). The district court in the present case concluded:

> Based upon the evidence presented at trial as set forth above, the Court finds that the evidence does not establish the conduct of the majority shareholders was such

as to deprive [Jones] of any return on her shares. It is quite possible that continuation of payment of commodity wages without the payment of dividends to shareholders would result in that finding, but based upon the evidence as was presented, the evidence at this time does not support a finding of oppression.

There is no clear authority in Nebraska as to exactly what might constitute oppression; thus, it is unclear on what basis the district court reached its conclusion that the evidence did not support a finding of oppression. We know that oppression does not include simply being unkind or mistrusting, see *Detter v. Miracle Hills Animal Hosp.*, 12 Neb. App. 480, 677 N.W.2d 512 (2004), *overruled in part on other grounds, Detter v. Miracle Hills Animal Hosp.*, 269 Neb. 164, 691 N.W.2d 107 (2005); nor does it include the failure to hold shareholders' meetings or appoint a second director, see *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001). Further, neither the Business Corporation Act applicable in this case, nor the new Nebraska Model Business Corporation Act, § 21-201 et seq. (Cum. Supp. 2016) (operative January 1, 2017), provide any guidance on what constitutes oppressive conduct. Therefore, it is helpful to consider decisions in other states which involve alleged oppressive conduct in closely held farming or ranching corporations.

In *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663 (Iowa 2013), the Iowa Supreme Court similarly noted the absence of any definition of oppressive or oppression in Iowa's Business Corporations Act. *Baur Farms, Inc.* observed that its court of appeals had examined the decisions of other jurisdictions and "concluded oppression is 'an expansive term used to cover a multitude of situations dealing with improper conduct which is neither illegal nor fraudulent.'" 832 N.W.2d at 670. *Baur Farms, Inc.* quoted from an Oregon case as an example of oppression:

"[T]he case of the shareholder-director-officers refusing to declare dividends, but providing high compensation

for themselves and otherwise enjoying to the fullest the 'patronage' which corporate control entails, leaving minority shareholders who do not hold corporate office with the choice of getting little or no return on their investments for an indefinite period of time or selling out to the majority shareholders at whatever price they will offer."

832 N.W.2d at 670.

*Baur Farms, Inc.* further noted:

Other jurisdictions have developed several sometimes overlapping standards for evaluating minority shareholders' claims of oppression in closely held corporations. Some have concluded oppression is "'burdensome, harsh and wrongful conduct' . . . or 'a visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a corporation is entitled to rely.'" . . . Other courts have linked oppression to the derogation of the fiduciary duty "of utmost good faith and loyalty" owed by shareholders to each other in close corporations. . . .

A third approach, now perhaps the most widely adopted, links oppression to the frustration of the reasonable expectations of the corporation's shareholders. . . .

Courts applying the reasonable expectations standard have granted relief when the effect of a majority shareholder's conduct is to deprive a minority shareholder of any return on shareholder equity.

832 N.W.2d at 670-71 (citations omitted).

*Baur Farms, Inc.* also addressed oppression in the context of stock transfer price restrictions, stating, "[s]ome courts have declined to enforce transfer price restrictions determined by formulas producing transfer prices so small in relation to the true value of the shares as to make the restrictions unconscionable or oppressive." 832 N.W.2d at 671. The Iowa Supreme Court adopted a "reasonableness standard" for evaluating minority shareholder claims of oppression, noting that

"[m]anagement-controlling directors and majority sharehold-
ers of such corporations have long owed a fiduciary duty to
the company and its shareholders." *Id*. at 673-74. Further, this
duty "encompasses a duty of care and a duty of loyalty to the
corporation" as well as a duty to "conduct themselves in a
manner that is not oppressive to minority shareholders." *Id*. at
674. The Iowa Supreme Court held that "majority shareholders
act oppressively when, having the corporate financial resources
to do so, they fail to satisfy the reasonable expectations of a
minority shareholder by paying no return on shareholder equity
while declining the minority shareholder's repeated offers to
sell shares for fair value." *Id*. With regard to determining fair
value, the court stated:

> Where stock transfer restrictions have provided for
> purchase by a corporation at book value, some courts
> have concluded the restrictions may be enforced if the
> value has been determined in accordance with gener-
> ally accepted accounting practices. [Citations omitted.]
> Significant discrepancies between market value and book
> value have cast doubt on the enforceability of provisions
> requiring transfers at book value. [Citations omitted.]
> Courts will thus consider whether the accounting methods
> used in establishing book value are fair and equitable
> to all the parties involved, and where arbitrary valua-
> tions appear on the books, courts have substituted values
> derived from acceptable accounting procedures.

*Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 675-76 (Iowa
2013).

As in the case before us, *Baur Farms, Inc.* also involved
a closely held corporation in which the minority shareholder
"has no access to an active market in its shares that might
allow his realization of a return on his equity position." 832
N.W.2d at 676. And like the minority shareholder in *Baur
Farms, Inc.*, Jones lacks the "voting power to force the board
of directors to set a book value that is reasonably related to
the fair value of the company's assets." 832 N.W.2d at 676.

Because the district court in *Baur Farms, Inc.* had dismissed the case after the minority shareholder's presentation of evidence, the Iowa Supreme Court reversed, and remanded for the district court to take any additional evidence to determine the fair value of minority shareholder's equity interest in the corporation, and to apply the reasonable expectation standard it adopted in its opinion to determine if the corporation had acted oppressively. And, notably, if the conduct was determined to be oppressive, *Baur Farms, Inc.* acknowledged the district court's equitable authority to be "flexib[le] in resolving the dispute." 832 N.W.2d at 677.

Another state has carefully considered the issue of oppression in a closely held ranching corporation. The Montana Supreme Court has stated, "Oppression may be more easily found in a close-held, family corporation than in a larger, public corporation." *Skierka v. Skierka Bros., Inc.*, 192 Mont. 505, 519, 629 P.2d 214, 221 (1981). And in *Fox v. 7L Bar Ranch Co.*, 198 Mont. 201, 209, 645 P.2d 929, 933 (1982), it stated, "Shares in a closely held corporation are not offered for public sale. Without readily available recourse to the market place, a dissatisfied shareholder is left with severely limited alternatives if one group of shareholders chooses to exercise leverage and 'squeeze' the dissenter out." The Montana Supreme Court also noted that while many courts hold that "'oppression suggests harsh, dishonest or wrongful conduct,'" there are other courts that "find it helpful to analyze the situation in terms of the 'fiduciary duty' of good faith and fair dealing owed by majority shareholders to the minority." *Id*. And "'other commentators have developed a definition for oppression in terms of "the reasonable expectations of the minority shareholders in light of the particular circumstances of each case." . . .'" *Id*. at 209-10, 645 P.2d at 933.

*Fox v. 7L Bar Ranch Co., supra*, involved a closely held family corporation (7L Bar Ranch) consisting of 17,600 acres of largely grazing land which was being leased at considerably less than its market value. The 7L Bar Ranch corporation

was interrelated to two other family corporations, one of which was the sole user of 7L Bar Ranch's grazing land. A dispute arose between two brothers. One brother claimed that the cashflow of the corporation in which he had a 50-percent interest was controlled by one in which he had a 25-percent interest; the complaining brother never received any dividend or remuneration of any kind from any of the corporations even though two of the businesses showed retained earnings of over $400,000 and one of them had cash assets that exceeded $400,000. The Montana Supreme Court agreed that this inter-relationship of corporations allowed one brother to control whether a profit was made by any corporation in which the other brother held stock. The court noted:

"Although dividend withholding is used as a squeezeout technique and is used in corporations of all sizes, this technique (indeed practically all squeeze techniques) is applied most frequently in close corporations . . . . 'Most of the abuses in the field of dividend policy have occurred among the smaller corporations, especially in cases where there is a concentrated control in a single family.' . . ."

*Id*. at 211, 645 P.2d at 934. The court went on to say:

"The enterprise before us is a 'close corporation' in the strictest sense, that is, one in which, regardless of the distribution of the shareholdings, 'management and ownership are substantially identical' . . . . In such a case, it seems almost self-evident, the fiduciary obligation of the majority to the minority extends considerably beyond what would be its reach in the context of a larger or less closely held enterprise. Here the relationship between the shareholders is very much akin to that which exists between partners or joint venturers."

*Fox v. 7L Bar Ranch Co*., 198 Mont. 201, 213, 645 P.2d 929, 935 (1982).

The Montana Supreme Court observed that "[t]his is a case where control of a set of corporations, designed to be run by

one person, brought to boil an already bitter family struggle between people with a demonstrated inability to get along." *Id*. at 214, 645 P.2d at 936. The court concluded the excluded brother "had a reasonable expectation of sharing in his inheritance." *Id*. The Montana Supreme Court affirmed the district court's finding of oppression (and deadlock in voting power) and its order dissolving 7L Bar Ranch corporation.

Fortunately in the case before us, there does not appear to be a bitter family struggle or an inability to get along; however, there has been a denial of the two minority shareholders' reasonable expectation of sharing in their inheritance. Applying the legal principles set forth in Iowa and Montana, majority shareholders act oppressively when, having the corporate financial resources to do so, they fail to satisfy the reasonable expectations of a minority shareholder by paying no return on shareholder equity while declining the minority shareholder's repeated offers to sell shares for fair value. The majority shareholders in this case, however, might suggest that corporate financial resources are not available because the net income has been reduced by payment of commodity wages (to which they claim entitlement for payment of past services) in an effort to control taxable corporate income. I do not find this position persuasive for the reasons already stated. Additionally, even if the use of commodity wages may be a preferred method of income distribution for an agriculture-based corporation, its availability does not by itself justify the use of commodity wages to avoid sharing profits with other shareholders.

I agree with the following: Commodity wages can be paid in lieu of actual wages; commodity wages may be preferred over actual wages, because the corporation can avoid payment of payroll taxes; and minimizing a corporation's taxable income is a worthy goal. However, paying corporate profits to only certain shareholders and calling them commodity wages for unpaid past services does not, in my opinion, pass muster. There is no question that attempting to minimize the payment

of taxes through various tools and exceptions allowed under the tax code is a common pursuit. As Judge Learned Hand has been often quoted to say:

[A] transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose[s], to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.

*Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934). By all appearances in *Gregory*, a shareholder's alleged corporate reorganization was on the surface consistent with applicable laws, and that shareholder was able to accomplish the sale of certain stock at a lower taxable rate as part of that process. However, the *Gregory* court went on to conclude that the shareholder in that case had engaged in "an elaborate scheme to get rid of income taxes" which did not properly fall within the intention of the corporate reorganization laws. 69 F.2d at 810.

My reference to the *Gregory* case is not to suggest any "elaborate scheme" to avoid income taxes took place here; rather, the point is that just because the tax code allows the use of commodity wages does not mean that commodity wages were intended to be used in the way they were used here—as an alternative method of deferred or catch-up or gratuitous or "morally" owed compensation—especially when there is no evidence documenting any agreement or other obligation by the corporation to pay wages of any type (as officers, directors, or employees) to any of the shareholders in this case.

The majority opinion seems to suggest that the commodity wages paid here are justified because Maltzahn said they were reasonable and "Jones' own expert, Scow, could not opine whether the wages paid were appropriate, and he also conceded that an annual farm management fee of 7 percent to 10 percent of gross income would be reasonable." However,

Christopher Scow made it clear that he could not say whether the commodity wages paid in this case were appropriate because he did not know "what activities Charles was providing and being paid for." Scow said the same thing regarding commodity wages paid to Randall and Donald: "I cannot make a determination if it's appropriate, because I do not know what services they actually provided." Further, it is not particularly relevant to the case before us that farm managers for absentee owners are paid 7 to 10 percent of the gross income produced on a farm. This case does not involve absentee owners; in fact, the familial relationship between the owners and farm tenants in this case would have significantly minimized the need for much of the work provided by a farm management company. Absentee farm owners are obviously agreeing in advance to pay that 7- to 10-percent farm management fee; when grain is sold and income is received, Scow said "we will deduct the percentage of our fee at that time." Scow testified that he sat in meetings with prospective clients, most often with the farm manager, to explain the services provided, such as bookkeeping and accounting and insuring the property. Scow's company generated monthly or quarterly reports, and it had its own accounting and bookkeeping staff. There is no evidence in the present case of any verbal or written agreements regarding fees or wages for any particular services, nor, according to Randall's own testimony, was there any expectation that such fees or wages would be paid. Notably, when Scow was asked if he had heard of "other farm managers receiving income in years after the services for which it was performed," he responded, "I've not heard of that, no. I've not heard of anyone else doing that."

The commodity wages paid to Randall, Donald, and Charles for alleged unpaid (and undocumented) past services are an unfair and unjustified business decision that was disguised as an acceptable tax reduction policy. Under this tax practice, Randall and Donald can indefinitely pay themselves unlimited commodity wages for past services, because there

is no agreement or other documentation to support the timing or the value of those services. It can be any amount, for any vaguely described service, rendered at no specific time. When asked how much more he thought he was owed in back wages, Randall said, "I have no idea." And when asked if he had even started to calculate that, Randall replied, "No," and he had "[n]o idea" whether he was done paying back wages to Donald and himself. Further, Randall's own testimony made it clear that no consideration was ever given to sharing any portion of the corporation's net profits with the minority shareholders because "[t]hey hadn't done anything for the corporation."

The majority opinion inappropriately characterizes this dissent's discussion of the commodity wage issue as an "attempt[] to shame Donald and Randall for the shares their parents obviously believed they deserved." To the contrary, this dissent has focused on Randall and Donald operating under a mistaken (not shameful) impression that they were entitled to keep all of McDonald Farms' profits, because they did the farming and their sisters did not. Understandably, the idea of having to share those profits with their sisters was new to Randall and Donald, because the brothers had only recently acquired their majority interest in the corporation in June 2012. And further, because the farm economy was good at that time (high commodity prices), they found themselves in the fortunate position of having large amounts of corporate profits available for distribution, another new concept for them as new majority shareholders of McDonald Farms. But just because they were inexperienced in finding themselves in such a situation does not justify the decision they made to completely exclude their sisters from a share of those profits.

The majority opinion also says that Charles "not only acquiesced, but also initiated and partook in the decision to pay commodity wages to the majority shareholders as a tax planning strategy." However, Randall testified that after Charles fell and hit his head in July 2012, he did not make

any financial decisions for himself. Randall acknowledged that Charles did not participate in the conversations with Maltzahn about payment of commodity wages in 2013 (totaling $397,200) and that Charles "probably was not" part of those conversations for the 2012 commodity wages (totaling $231,300) either. Randall also acknowledged that after Charles "went into the hospital and Riverside Lodge" (following his fall in July 2012), Randall handled Charles' affairs pursuant to a power of attorney.

The majority states that this "dissent's claim that [Jones'] reasonable expectations were violated as a result of payment of commodity wages" is "suspect," because commodity wages were not even paid between December 2010 (when Jones received her shares) and January 2012 (when Jones sought to be bought out). However, commodity wages were paid in 2010, so the practice of distributing net income by that method rather than dividends was a practice Jones would have known to exist upon acquiring her shares in the corporation. Additionally, Jones did not file a lawsuit until April 1, 2013, after the 2012 commodity wages ($231,300) were paid to the majority shareholders and no dividends were issued to the minority shareholders. The sisters' reasonable expectations of benefiting from their inheritance either by dividends or by having their interest in the corporation bought out commenced upon acquiring their shares. Further, the issue is not just that commodity wages were distributed only to some shareholders for alleged unpaid past services, the issue is that profits were not being shared with all shareholders in a good faith, fair manner, as became more evident with the 2012 and 2013 commodity wage payments. And contrary to the majority's implication, this dissent is not invading the province of the estate planning decisions made by Charles and Betty; nor is it disregarding Jones' "total lack of involvement in the family farm." Rather, the focus of this dissent is on the reasonable expectations of shareholders in a corporation. And just because the sisters did not pay for their shares (notably, neither did Randall or Donald), nor contribute

to the farm labor, does not mean that they should be excluded from corporate profits being enjoyed by other shareholders. Randall and Donald failed to exercise their fiduciary duty of good faith and fair dealing with Jones and Rosemary when they made the decision to distribute profits only to themselves under the guise of commodity wages for past unpaid services instead of distributing those profits in proportionate shares to all shareholders; or alternatively, by failing to consider a reasonable buyout of Jones' shares for fair value. Under any standard for evaluating a minority shareholder's claim of oppressive conduct, as discussed previously, this should qualify as oppressive conduct.

*Alternatives to Dissolution*
*of Corporation.*

Having concluded the evidence supports a finding of oppressive conduct, I also agree that dissolution is a drastic measure and should be invoked with extreme caution. See *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001). Even Jones says it is not her "preference to force a dissolution of McDonald Farms. Rather, she wants simply to be paid fair value for her shares and leave Rand[all] and Don[ald] to run the business of McDonald Farms." Brief for appellant at 39. Jones suggests it is within the district court's equitable authority to order a buyout of Jones' shares at fair value. I agree that a district court has the authority to fashion equitable alternatives to a corporate dissolution in order to avoid such a drastic measure; in this case, there may also be other alternatives to dissolution or a buyout. Nebraska Supreme Court cases provide some guidance on this issue.

Beginning with the notion that an officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and is treated by the courts as a trustee, our Supreme Court has stated:

An officer or director must comply with the applicable fiduciary duties in his or her dealings with the corporation

and its shareholders. . . . Where a director has acted in complete good faith and breached no fiduciary duties, he or she is not liable for mere mistakes in judgment. . . . However, a violation by a trustee of a duty required by law, whether willful, fraudulent, or resulting from neglect, is a breach of trust, and the trustee is liable for any damages proximately caused by the breach.

*Trieweiler v. Sears*, 268 Neb. 952, 973, 689 N.W.2d 807, 830-31 (2004) (citations omitted).

*Trieweiler* also tells us that "[e]quity is not a rigid concept, and its principles are not applied in a vacuum, but instead, equity is determined on a case-by-case basis when justice and fairness so require." 268 Neb. at 980, 689 N.W.2d at 835. And when "a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation." *Id*. at 980, 689 N.W.2d at 835-36. Finally, "[w]here relief may be granted, although no precedent may be found, the court will so proceed," *id*. at 980, 689 N.W.2d at 836, and "[e]quity will always strive to do complete justice[,]" *id*. at 981, 689 N.W.2d at 836. *Trieweiler* permitted a minority shareholder to individually recover money in his corporate derivative action based on misappropriation of money by the corporation, among other things. Our Supreme Court noted that "there are circumstances in which individual damages may be appropriately awarded in connection with a derivative action." *Id*. at 971, 689 N.W.2d at 829. In the case at hand, for example, one alternative to dissolution or a forced buyout might be to require the brothers to pay the sisters their proportionate share of the $628,500 in corporate profits that were distributed as commodity wages in 2012 and 2013.

To the extent a buyout is the preferred alternative, it is clear that a determination of the fair value of a corporation's shares should comply with some established legal principles. See *F.H.T., Inc. v. Feuerhelm*, 211 Neb. 860, 320 N.W.2d 772 (1982) (book value is determined by generally accepted accounting

principles; as applied to corporate stock, book value ordinarily means net value shown on corporate books of account of all assets of corporation after deducting all liabilities); *Trebelhorn v. Bartlett*, 154 Neb. 113, 47 N.W.2d 374 (1951) (actual value of corporate stock of closely held corporation is ordinarily determinable from then net worth of corporation divided by number of bona fide shares issued and outstanding; for that purpose, evidence of factors and elements, such as assets, liabilities, and all other matters pertinent to value of particular corporation involved, may be admitted and considered); *Shuck v. Shuck*, 18 Neb. App. 867, 806 N.W.2d 580 (2011) (to determine value of closely held corporation, trial court may consider nature of business, corporation's fixed and liquid assets at actual or book value, corporation's net worth, marketability of shares, past earnings or losses, and future earning capacity; method of valuation used for closely held corporation must have acceptable basis in fact and principle).

Also, as previously noted in *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663 (Iowa 2013), when stock transfer restrictions have provided for purchase by a corporation at book value, some courts have concluded the restrictions may be enforced if the value has been determined in accordance with generally accepted accounting practices; however, significant discrepancies between market value and book value should cast doubt on the enforceability of such a provision. Courts should consider whether the accounting methods used in establishing book value are fair and equitable to all the parties involved, and where arbitrary valuations appear on the books, courts can substitute values derived from acceptable accounting procedures. *Id.*

Based on these legal principles, there are alternative equitable measures that can be taken to avoid corporate dissolution while providing some relief to Jones as a result of her brothers' oppressive conduct in denying her a proportionate share of the corporation's net profits or, alternatively, refusing to buy out her shares at fair value.

## CONCLUSION

In conclusion, I refer to the 2012 Census of Agriculture: Nebraska State and County Data, 1 Geographic Area Series Pt. 27, U.S. Dept. of Agric., Pub. No. AC-12-A-27 (May 2014), which reveals that the total number of farms in Nebraska at that time was 49,969, comprising 45,331,783 acres of land. A family or individual owned 42,543 of those farms; 2,974 were owned by partnerships; 3,784 were owned by corporations (of which 3,580 were family held corporations); and a small number were held by others such as estates, trusts, and cooperatives. *Id.* The average age of the principal operators of the family-held farming corporations was 57. *Id.* What this tells me is that there are thousands of family farm corporations approaching possible transfers of ownership, which we can only hope will not end up in litigation as occurred here. The drain on family and community resources, and more importantly, the deterioration of family relationships that such disagreements may cause, can be minimized if the Legislature and the courts provide adequate guidance and alternatives for resolving such conflicts. This is an important issue, and this dissent is not the place for an exhaustive discussion of that issue. Dissolution of a family farming corporation is an extreme remedy and is rightly disfavored absent extreme circumstances. I agree with the district court's decision to refrain from ordering dissolution in this case; however, I do think the law authorizes district courts to consider equitable alternatives, as discussed. I would have reversed, and remanded for the district court's further consideration of those alternatives.